**In re CLE CORPORATION, Debtor.**

**Bankruptcy No. 85–06877.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

March 4, 1986.

Dennis S. Meir, Kilpatrick & Cody, Atlanta, Ga., Sandra E. Mayerson, Kirkland & Ellis, Chicago, Ill., for petitioners.

C. David Butler, Alston & Bird, Atlanta, Ga., Stewart E. Bland, Barnett & Alagia, Louisville, Ky., for debtor.

## ORDER FOR RELIEF

STACEY W. COTTON, Bankruptcy Judge.

On September 13, 1985, Quaker State Oil Refining Corporation ("Quaker State"), S & C Electric Company ("S & C"), Central Bank ("Central Bank"), and First State Bank ("First State"), the original petitioners herein, filed with the United States Bankruptcy Court for the Northern District of Illinois, Eastern Division (the "Illinois Court"), a petition (the "Petition") seeking entry of an order for relief under Chapter 11 of Title 11, United States Code (the "Bankruptcy Code"), against CLE Corporation (the "Debtor").

On or about October 15, 1985, the Debtor filed in the Illinois Court its motion to dismiss the Petition or, in the alternative, to transfer the case initiated by the Petition to this Court. Thereafter, the Illinois Court entered an order denying the Debtor's motion to dismiss and transferring this case to this Court pursuant to 28 U.S.C. Section 1412 (the "Transfer Order").

On December 16, 1985, the Debtor filed an answer and counterclaim to the Petition asserting that the Petition had been filed in bad faith, that the claims of three of the four petitioners were subject to a bona fide dispute, that the Debtor has more than twelve unsecured creditors, and that the Debtor is generally paying its debts as they come due. Subsequent thereto, a fifth creditor, St. Elizabeth Hospital Medical Center ("St. Elizabeth") joined in the Petition.

On January 17, 22, and 29, 1986, the Court conducted an evidentiary hearing on the Petition (the "Trial"), at which time the Court took testimony, admitted documentary evidence, and heard the arguments of counsel. At the trial, the Debtor stipulated to the validity of the claims of two of the petitioners, Quaker State and S & C. For the reasons set forth below, the Court concluded at the end of the trial that an Order for Relief should be entered in this case.[1]

## FINDINGS OF FACT

The Debtor is engaged in the business of leasing and selling computer equipment.

Each of the petitioners and Debtor entered into the Debtor's form "Flexmaster Lease" pursuant to which the Debtor leased certain items of computer equipment to each of the petitioners. The Debtor financed the purchase of the equipment and executed non-recourse promissory notes in favor of the lender. As security therefor, the Debtor assigned to the lender its leases with the petitioners together with the rental stream from each such lease and the leased equipment. The petitioners made their monthly lease payments directly to the lender. Each of these leases contains a "walkaway provision," which permitted each of the petitioners, after certain specified time periods, to exercise an option to replace, upgrade or terminate with respect to specific items of equipment.

Each of the Debtor's leases with the petitioners provides that, upon the exercise of the walkaway option, the Debtor guarantees to satisfy the lease obligation, either by subleasing the equipment from the petitioners or by paying the present value of the amount still owed to the lender. Four of the petitioners exercised the walkaway provision and elected to have the Debtor sublease the old equipment. In each case, the Debtor removed the old equipment and commenced making sublease payments.[2] In each case, upon the petitioner's exercise of its options and continuously until May of 1985, the Debtor honored its obligations and made all payments as required. Debtor never questioned the propriety of the exercise of these rights by the respective petitioners.

---

1. This Order for Relief shall constitute findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, which is made applicable in this case by Bankruptcy Rules 7052 and 1018.

2. S & C exercised the walkaway provision but chose a lump sum payout. Although acknowledging this obligation to S & C, the Debtor has never picked up the equipment nor made the required payment.

Beginning in May of 1985, however, the Debtor ceased making payments on behalf of the petitioners and other similarly situated creditors to whom the Debtor was obligated. By letters dated May 16, 1985, the Debtor notified petitioners and certain of its other lessees that the Debtor "must temporarily discontinue remitting rental payments" due to "market conditions" and "circumstances beyond our control." Similar letters were sent by the Debtor to other creditors during the months of June and July 1985. The Debtor never resumed making such payments.

Subsequent to sending the letters, the Debtor attempted to meet with its creditors and negotiate settlements. In each case, the Debtor acknowledged its indebtedness and explained that it would run out of cash in 45–60 days if it continued to make its sublease payments. The Debtor also indicated at such meetings that it was unable to make these payments, that it could not resume payments for at least two years or more and that it was uncertain whether it would ever be able to make such payments. In fact, Debtor used its financially distressed condition as a bargaining chip in its efforts to negotiate settlements with sublease creditors.

It was only after the filing of the Petition that Debtor claimed to dispute the claims of three of the petitioners, First State, Central Bank, and St. Elizabeth. The Debtor's president, Raymond J. Homa, acknowledged at the trial that none of the Debtor's disputes with respect to these claims were developed until after meeting with counsel subsequent to the filing of the Petition and that, until the Debtor realized it was about to run out of cash, it recognized and paid these obligations monthly. Testimony of Raymond J. Homa, Trial Transcript, Jan. 17, 1986, at 85, 86, 90–93 [hereinafter cited as "Tr I"]. Mr. Homa further testified that the Debtor had made a business decision not to question the lessees' exercise of their rights under the leases. This was based on Debtor's preference of having a happy customer rather than one with whom it was in dispute. No credible evidence of a specific dispute or specific amount in dispute was presented by the Debtor at the trial. The evidence is clear, and this Court finds, that the sole reason that the Debtor suspended the payment of its contractual obligations was because it was about to run out of money, and not because it disputed those obligations.

The lease with each petitioner provides in Section 9.1 thereof that an event of default requires written notice with a right to cure on the part of the lessee. No notices of default were sent by the Debtor to any of the petitioners. Testimony of Raymond J. Homa, Trial Transcript, Jan. 22, 1986, at 102 [hereinafter cited as "Tr II"]. Thus, even if an event of default existed, the Debtor has made no effort to comply with the terms of its own agreement.

This Court is persuaded from the evidence that even if technical objections to the petitioners' claims could have been made, the Debtor waived those objections, at the least until Debtor gives proper notice. Further, the evidence was insufficient to establish that any pre-conditions to the requirement of the Debtor to assume the lease obligations had not been met.

According to the Debtor's financial statements and to the testimony of the Debtor's accounting manager, the net worth of the Debtor as of the end of the Debtor's last fiscal year (June 30, 1985) was negative $14,500,000. Exhibit P–1; testimony of David Bickers, Tr I at 28. The Debtor's financial statements for that period reflect a loss in excess of $12 million. The Debtor's auditors issued a going concern qualification to the Debtor's June 30, 1985, financial statement and disclaimed issuance of an opinion because of the "uncertainties" regarding the Debtor's ability to continue to exist. Exhibit P–7; testimony of David Bickers, Tr I at 30.

The Debtor's books and records reflect a liability to each petitioner for the sublease obligations. The Debtor's aggregate sublease and early termination liabilities, according to its own financial records, are currently almost $1.2 million. That amount

increases by approximately $90,000 per month and may increase at an even greater rate as more and more lessees exercise their walkaway options. *See* Exhibit P–8 through P–17; testimony of David Bickers, Tr II at 35.

The Debtor's leasing business has dwindled to almost nothing. It has written only one new lease in the past year. Debtor has been forced to change the focus of its business with the result that its revenues are now derived almost solely from used equipment sales. Those revenues average only $500,000 to $600,000 per month. The Debtor does not have sufficient cash to pay its aggregate unpaid liabilities, has not paid its sublease or early termination obligations since May 1, 1985, and only pays its day-to-day operating expenses each month.[3]

## II. CONCLUSIONS OF LAW

### A. *The Good Faith Issue*

■ It is well established that good faith is presumed on the part of the party or parties filing an involuntary petition and that the burden of proving bad faith rests on the objecting party. *In re Crown Sportswear, Inc.*, 575 F.2d 991, 993–94 (1st Cir.1978); *In re Alta Title Co.*, 55 B.R. 133, 13 B.C.D. 1035 (Bankr.D.Utah 1985); *In re Rite-Cap, Inc.*, 1 B.R. 740, 742 (Bankr.D.R. I.1979); *See Basin Elec. Power Coop. v. Midwest Processing Co.*, 769 F.2d 483, 486 (8th Cir.1985), *petition for cert. filed*, (November 22, 1985). This burden is a significant one, as the objecting party must prove bad faith by at least a preponderance of the evidence. *See In re Alta Title Co.*, 55 B.R. 133, 13 B.C.D. at 1039–40.

The Illinois Court in its Transfer Order made certain determinations relating to the issue of good faith. This Court heard no evidence at the trial that leads it to reach a different conclusion.

In this Court's view, the communications from the Debtor in May and June 1985

announcing termination of sublease payments, the cessation of the sublease payments, subsequent conversations of Debtor's officers with petitioners and other sublessor creditors relating to the distressed circumstances of the Debtor, the representation by the Debtor's president that payment of all of its sublease obligations would result in the Debtor's running out of cash within 45 to 60 days, and the representation that payments could not be resumed for at least two years with no assurance that resumption of payments would ever occur, was sufficient to put the petitioners on notice that the Debtor was experiencing substantial financial problems.

■ The evidence shows a pre-petition effort by the petitioning creditors and their counsel to confer and consult together, to agree to act in concert for the good of themselves and other creditors and to negotiate separately with both the Debtor and the bank who financed the lease contracts. There were a series of negotiations in which the parties used every negotiating tactic, tool or idea at their disposal to try to persuade the other party to their point of view. Upon failure of such negotiations, the petitioners filed the involuntary petition. The testimony indicated that their objectives included reorganization of the Debtor, court supervision to permit all parties to be dealt with fairly, and an investigation and accounting of the assets and liabilities of the Debtor. These are all consistent with and appropriate to the purposes of an involuntary petition.

■ An issue was raised whether petitioners filed this case principally for the purpose of possibly relieving the lessees of liability to third party lenders. The evidence is not sufficiently strong or credible to warrant such a finding. The Court finds that the parties had normal negotiations and discussions of their options. This Court is not aware of any law that prohibits creditors from receiving whatever bene-

---

**3.** Of the $552,000 paid by the Debtor in November 1985, the last month for which the Debtor provided full financial information prior to the trial, the Debtor paid approximately $55,500 to its parent corporation in "consulting fees," "placement fees," and "commissions." Testimony of David Bickers, Tr I at 45, 49–51; Tr II at 49.

fits may be available to them once the case has commenced. On the contrary, the purpose of a Chapter 11 case, particularly an involuntary case, is to allow creditors to invoke the protection of the court to protect themselves, the Debtor's assets and, hopefully effect a reorganization.

■ This Court believes that it would be unwise and unreasonable to interpret every pre-petition posturing or negotiating tactic of a petitioning creditor or debtor as evidence of bad faith. Based on the Court's experience, the taking of extreme positions by both debtors and creditors during such negotiations are common. Such negotiating tactics simply do not rise to the level of bad faith. The Court believes that debtors, creditors, and their counsel should be encouraged to conduct pre-bankruptcy negotiations that might result in a non-bankruptcy resolution of the issues between them. They should not be placed in the position of avoiding negotiating for fear of a good faith objection to the eventual initiation of a bankruptcy case simply because they took a questionable pre-bankruptcy position. This is not to say that abuses should be permitted. Such abuses, however, should be determined on a case by case basis and must be proven to exist by competent evidence. The evidence before this Court does not warrant such a finding.

■ The Debtor at the trial also attempted to characterize as improper the communications with other creditors that were initiated by Stanley F. Slabas of S & C. The evidence does not establish impropriety or bad faith in Slabas's conduct. Slabas had the right to call other creditors of debtor. Based upon the information available to him, he had just reason to be alarmed and concerned, to seek additional information from other creditors, to consult with them, and even to solicit their cooperation and assistance in pursuing legitimate actions together. Clearly, the Bankruptcy Code contemplates such communications and cooperative action since it requires three (3) petitioning creditors to file an involuntary petition when debtor has more than twelve (12) creditors. 11 U.S.C. § 303(b).

■ In sum, the evidence relied upon by the Debtor falls short of the type conduct necessary to warrant the dismissal of this case for lack of good faith by the petitioners. On the contrary, the Court finds from the evidence that the petitioners had a number of legitimate reasons for initiating this case: to invoke the protection and supervision of the Court to protect themselves and other creditors; to investigate, account for, and protect the Debtor's assets; and to effect an orderly and effective reorganization of the Debtor under this Court's supervision. Accordingly, the Court concludes from a preponderance of the evidence that this Petition was filed in good faith.

### B. *The Bona Fide Dispute Issue*

Creditors having claims subject to a bona fide dispute are excluded from the petitioning-creditor and generally-not-paying determinations under 11 U.S.C. Sections 303(b) and 303(h).

■ The assertion of creative defenses by a debtor is not sufficient to establish a bona fide dispute. The Debtor's president has testified that none of the so-called disputes were developed until after he had met with counsel subsequent to the filing of the Petition. Testimony of Raymond J. Homa, Tr I at 85, 86, 90–93. Until that time, the Debtor uniformly acknowledged its obligations to its sublease creditors. Prior to May 1985, the Debtor had regularly paid the sublease obligations, and between the termination of those payments in May 1985 and the filing of the Petition, had acknowledged its obligations to each of the petitioners, expressed a desire to satisfy them, and even entered into negotiations with the petitioners to work out its obligations to them. The evidence is clear and undisputed that Debtor ceased making its sublease payments because it was about to run out of money. From both the timing and the substance of Debtor's alleged disputes, it is apparent that the Debtor's disputes are not in good faith and have been

raised solely for the purpose of opposing the Petition.

 The Debtor now asserts that certain conditions precedent to its sublease obligations were not satisfied and that there were events of default. The lease with each Petitioner whose claim is disputed, however, clearly states in Section 9.1 that an event of default does not occur until the lessee has received written notice of an alleged default from the Debtor and continues in default past a specified cure period. The Debtor concedes that no notices of default were ever sent to any of the petitioners. Testimony of Raymond J. Homa, Tr II at 102. Moreover, even if any of the petitioners had breached their leases in such a way that the Debtor was not required to enter into subleases with the breaching petitioners, the Debtor admits that for business reasons, it did so anyway. Thus, Debtor knowingly waived any alleged defaults.

There simply is no credible evidence before the Court establishing that the claims of First State, Central Bank, or St. Elizabeth are subject to bona fide disputes. The Debtor describes the disputes with the petitioners in terms of a "perceived" dispute, "suspected" default, or an "impression." Testimony of Raymond J. Homa, Tr II at 57–59. His testimony, however, does not establish any substantive dispute or defense to the claims of any of the petitioners. Accordingly, the Court concludes that each claim of the petitioners is not subject to bona fide dispute and each is qualified to be a petitioner in this involuntary case.

### C. *The Generally Not Paying Issue*

Pursuant to Section 303(h)(1), a court shall order relief against a debtor in an involuntary case "only if—the debtor is generally not paying such debtor's debts as such debts become due...." The burden of establishing that a debtor is generally not paying rests upon the petitioning creditors.

In adopting Section 303(h), Congress abandoned the balance sheet insolvency test of the Bankruptcy Act of 1898, as amended, in favor of an equity insolvency test which looks only at whether a debtor is paying its debts as they come due. *In re Central Hobron Asso.*, 41 B.R. 444, 447 (D.Hawaii 1984); *In re All Media Properties, Inc.*, 5 B.R. 126, 142 n. 5 (Bankr.S.D. Tex.1980), *aff'd*, 646 F.2d 193 (5th Cir.1981) (Unit A), (adopting bankruptcy court's opinion). No definitive meaning of this subsection is provided in the Code, thus the task of developing the appropriate factors for consideration in applying this test has fallen to the courts. 2 Collier on Bankruptcy ¶ 303.12[4] (15th ed. 1985). The cases that have considered this issue have rejected the contention that the generally-not-paying standard is a matter of simple mathematics requiring courts to establish a ratio of paid debts to unpaid liabilities. Instead, the courts have found a Congressional intent in Section 303(h) to grant more flexibility and to make it easier to commence involuntary proceedings against debtors. *In re All Media, supra; In re B.D. Int'l Discount Corp.*, 15 B.R. 755, 762 (Bankr.S.D.N.Y. 1981), *aff'd*, 24 B.R. 876 (S.D.N.Y.1982), *aff'd*, 701 F.2d 1071 (2d Cir.), *cert. denied* 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983). *See also In re Gill Enters.*, 15 B.R. 328 (Bankr.D.N.J.1981); *In re International Teledata Corp.*, 12 B.R. 879 (Bankr.D.Nev.1981); *In re Hill*, 8 B.R. 779 (D.Minn.1981).

The cases disclose a number of factors that are considered to indicate that a debtor is generally not paying its debts as they become due. In *All Media, supra*, the Court stated:

> [G]enerally not paying debts includes regularly missing a significant number of payments to creditors or regularly missing payments which are significant in amount in relation to the size of the debtor's operation.

5 B.R. at 143.

In *In re Reed*, 11 B.R. 755, 759–60. (Bankr.S.D.W.Va.1981), the court stated:

> Courts have used four factors in making [the Section 303(h) ] determination: the number of debts, the amount of delinquency, the materiality of nonpayment

and the nature of the debtor's conduct of his financial affairs.

\* \* \* \* \* \*

[T]otal past due indebtedness can be weighed more accurately when the debtor's liquid assets are known and when the past due amount is compared to the amount of new indebtedness accruing monthly. Accordingly, the initial factors of the number and amount of debts and their relationship to aggregate indebtedness and monthly accruals should be viewed in the context of the debtor's liquidity.

No one factor is necessarily determinative of whether in fact the Debtor is generally not paying debts as they become due. An examination of the Debtor's entire financial situation and debt structure may be necessary to make this determination. The Court now turns to the application of these factors to the present case.

1. *The number and amount of debts.* As indicated, the number alone is not conclusive. In the instant case, however, the Debtor filed a schedule of creditors as of September 13, 1985, the date of the involuntary petition, and a schedule as of December 16, 1985, the date the list of creditors was filed. These schedules reflect creditors as follows:

| Date | Number of Creditors Scheduled | Total Amount of Claims Scheduled | Total Amount of Unpaid Accrued Sublease Claims |
|---|---|---|---|
| 1985 | | | |
| 9/13 | *61 | *$72,387 | **$ 693,669 |
| 12/16 | *52 | *$54,279 | **$1,113,828 |

\* Petitioners' Exhibits "18 and 19".
\*\* Petitioners' Exhibits "16 and 17" and Debtor's Exhibit "D-13". These figures represent amount of accrual at the end of previous month, plus proration for 13 days of September and 16 days of December respectively.

The creditor schedule as of September 12, 1985 contains 44 undisputed claims totalling $72,387.00 and 17 disputed claims with no amounts shown. The creditor schedule as of September 16, 1985 contains 37 undisputed claims totalling $54,279.00 and 15 disputed claims with no amounts shown. Each claim listed by Debtor as disputed is a sublease claim. The accrued unpaid amount of the sublease claims on these dates is set forth above. (Petitioners' Exhibits "16 and 17"). Thus, it is apparent from an analysis of the Debtor's schedules and the unpaid sublease claims, as established by the evidence, that a small number of sublease creditors hold the greater amount of the debt and it is not being paid. This indicates Debtor is not generally paying its debts as they become due.

In this connection, a further comparison of the secured debt[4] and accrued accounts payable[5] can be made with accrued unpaid sublease obligations of Debtor as follows:

| Date | * Amount of Secured Claims | * Accrued Accounts Payable | Unpaid ** Accrued Sublease Liability |
|---|---|---|---|
| 1985 | | | |
| 5/31 | unavailable | unavailable | 123,581 |
| 6/30 | 439,652 | 129,634 | 247,163 |
| 7/31 | 346,150 | 184,699 | 538,434 |
| 8/31 | 290,980 | 113,045 | 647,562 |
| 9/30 | 244,409 | 146,753 | 753,955 |
| 10/31 | 82,577 | 97,137 | 860,037 |
| 11/30 | 230,353 | 104,751 | 962,661 |
| 12/31 | 228,814 | 174,839 | 1,062,367 |

\* Taken from Debtor's unaudited monthly statements for May through November 1985. (Petitioners' Exhibits "1-7" and Debtor's Exhibit "D-1").
\*\* Taken from Petitioners' Exhibits "16 and 17" and Debtor's Exhibit "D-1."

The above chart reflects that by August 31, 1985, Debtor's accrued unpaid sublease liability was $647,562 compared to total secured debt and accrued payables of $404,025. Thus, by August 31, 1985, the sublease debt exceeded other debt by $243,-537. If adjusted to include thirteen (13) days for September (a 13-day proration of the $106,393 September accruals), the sublease liability should be increased by $46,-

---

4. The secured debt appears to be held by three creditors. (Petitioners' Exhibits "1-7").

5. The number of creditors included in the accounts payable is unknown. (Petitioners' Exhibits "1-7.")

103 to a total of $693,665. This further indicates that Debtor is not paying its debts as they become due.

Debtor contends that the Court must look to all payments made by it during the period from May 1 through September 12, 1985 and September 13 to November 30. It contends that 237 creditors were paid $4,131,047 from May to September 12, 1985 and $1,669,321 from September 13 to November 30, for a total of $5,800,368, thus indicating that Debtor was paying its debts as they became due. The Court rejects this contention. The Debtor's evidence shows cumulative totals with no monthly breakdown which would enable the Court to make similar analysis on a monthly basis. (Debtor's Exhibits "10(a) and 10(b)"). Such cumulative analysis can, and in the instant case, does distort Debtor's true financial picture. The Court believes that a more accurate analysis can only be made if done at customary monthly accounting intervals. The Debtor's evidence does not permit such analysis and is insufficient to rebut petitioners' evidence that the Debtor was generally not paying its debts as they became due.

2. *Amount of the Delinquency.* Next, the Court must look at the nature and amount of the delinquency in relation to the aggregate indebtedness. This analysis includes an examination of whether the Debtor is regularly missing a significant number of payments to creditors or regularly missing payments which are significant in amount as it relates to the Debtor's size of operation. The evidence shows that the Debtor has been paying all operating costs and creditor claims except its sublease liability. As reflected on Petitioners' Exhibits "16 and 17" and Debtor's Exhibit "D-13", the unpaid sublease liability began in May 1985 at $123,581 and increased monthly to $1,062,367 by December 31, 1985. The evidence shows a rapid buildup of unpaid sublease debt. This increase will continue at about $90,000 per month, subject to further significant increase should other lessees exercise their termination rights. Thus, it is apparent that the Debtor's delinquency is significant and that Debtor has been regularly missing a significant number and amount of payments to creditors.

3. *Liquidity vs. Amount of Delinquency.* The effect of Debtor's missed payments can be more accurately weighed when compared with Debtor's monthly liquidity and monthly accruing liabilities This is best illustrated by comparison of the cash changes in Debtor's monthly financial condition (Petitioners' Exhibits "1–7") to the monthly accruals of Debtor's unpaid sublease obligations shown as follows:

| Date | Total Cash Generated | Total Cash Expended | Total Change in Cash for Period | Unpaid Accrued Sublease Liability |
|---|---|---|---|---|
| 1985 | | | | |
| 7/31 | $707,992 | $ 663,681 | $ 44,311 | $538,434 |
| 8/31 | 517,033 | 534,669 | (17,636) | 647,562 |
| 9/30 | 890,261 | 1,054,177 | (163,916) | 753,955 |
| 10/31 | 724,644 | 646,214 | 78,430 | 860,037 |
| 11/30 | 526,767 | 552,314 | (25,547) | 962,661 . |

The above facts show a Debtor who only possessed the ability to meet monthly operating expenses and current secured debt as opposed to the long term accruing unpaid sublease debt. This demonstrated inability to pay, coupled with the long term rapid build-up of sublease debts, indicates an inability of Debtor to meet its obligations as they become due. As noted by the court in *All Media, supra,* a comparison of defaults of long duration should be viewed differently than those of short duration. However, when the Debtor rejects its obligation to make further payments to specific creditors whose delinquencies will build up rapidly and will continue for an extended time, this fact should be considered much as defaults of long duration. Thus, the above figures are much more revealing than a simple count of unpaid claims. Debtor had a negative cash or liquidity position for three of the five months. Even on an aggregate basis it had a significant negative position. Clearly, from a cash or liquidity standpoint, this Debtor was unable to meet its debts as they became due.

4. *Nature and Conduct of Debtor's Financial Affairs.* Lastly, the Court should examine the Debtor's overall handling of its financial affairs. More specifically, the Court must inquire whether they are being handled in a manner consistent with good faith and in the ordinary course of business. The existence of a reasonable basis for nonpayment is important. In the instant case, the reason for nonpayment is clearly the Debtor's acknowledged inability to meet these obligations as they become due. It would run out of money in 45 to 60 days. This is contrasted with Debtor's prompt payment of other operating expenses, accounts payable and secured debt. In fact, there was testimony that Debtor not only was paying these items promptly, but, in some cases, was actually paying earlier than required.

The equipment which is the subject of the leases has suffered significant loss in value and Debtor has been forced to change its business from leasing to used equipment sales. This has resulted in significant changes in Debtor's operations, personnel and cash flow. Thus, the debt is on the increase while assets continue to decrease in value and Debtor struggles to reorganize its business.

The Court concludes after consideration of all of the facts that the Debtor is generally not paying its debts as they become due. The testimony of the Debtor's president and accounting manager indicates that the Debtor has failed to pay a significant portion of its debt for a material amount of time, and that the Debtor's sole reason for nonpayment was that it was about to run out of money. At trial, the Debtor's aggregate past due unpaid obligations, according to its own financial statements, was almost $1.2 million. There has been no reduction in the past due indebtedness and, in fact, that amount is increasing by approximately $90,000 per month. The Debtor does not have sufficient cash to pay its past due liabilities, has not paid any of its sublease and early termination obligations since May 1, 1985, and only pays its day-to-day operating expenses of about $500,000 per month. This it must pay simply to get by. Its revenues and other liquid assets are insufficient to enable it to do any more than simply meet those day-to-day expenses. Considered in the context of its substantial negative net worth, the huge loss sustained by it in its last fiscal year and its deteriorated operations, the Debtor's unpaid obligations will only continue to increase, absent a reorganization.

III. CONCLUSION

The Court concludes that none of the petitioners' claims are subject to bona fide disputes, that the Debtor is generally not paying its debts as they become due, and that the Petition was not filed in bad faith. Accordingly, the Court hereby orders relief against the Debtor under Chapter 11 of the Bankruptcy Code; and it is

FURTHER ORDERED that the Debtor shall file a list of creditors, schedules of assets and liabilities, a statement of financial affairs, and a statement of executory contracts within fifteen (15) days after entry of this Order for Relief, as required by Bankruptcy Rule 1007; and it is

FURTHER ORDERED that the Clerk of this Court shall notify the Debtor, its creditors, and other parties in interest that this Order for Relief has been entered, that the filing of the Petition operates as an automatic stay, and of the time and place scheduled for the meeting of creditors.

IT IS SO ORDERED.