**In the Matter of David Lee SMITH, a/k/a David L. Smith, Debtor.**

**Bankruptcy No. 98–66418–WHD.**

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Feb. 25, 1999.

Scott B. Riddle, Shapiro, Fussell, Wedge, Smotherman & Martin, Atlanta, GA, for David Lee Smith.

J. Littleton Glover, Jr., Glover & Davis, P.A., Newnan, GA, for Steinemann Development Company.

## *ORDER*

W. HOMER DRAKE, Jr., Bankruptcy Judge.

Before the Court is David L. Smith's Motion for Directed Verdict, and for Recovery of Fees, Expenses, and Actual and Punitive Damages Against Petitioner Steinemann Development Company. After four days of trial in October, 1998, the Court took the matter under advisement. David L. Smith ("Smith") and Steinemann Development Company ("SDC") have submitted extensive pre and post-trial briefs on the issues involved in this proceeding. This matter falls within the subject matter jurisdiction of the Court, *see* 28 U.S.C. § 157(b)(2)(A & O), and the following constitutes the Court's findings of fact and conclusions of law. *See* FED.R.BANKR.P. 7052.

### PROCEDURAL HISTORY

On April 8, 1998, SDC filed an involuntary Chapter 7 petition against Smith. On the face of the involuntary petition, SDC alleged that it was eligible to file the petition and that Smith was generally not paying his debts as such debts became due. Contemporaneous with the petition, SDC filed Supplemental Allegations wherein it claimed in paragraph three that Smith owed it between $600,000 and $900,000.

Smith has vigorously defended the involuntary petition. Early in the proceedings, Smith requested that SDC be required to post an indemnity bond. By Order entered on May 18, 1998, the Court required SDC to post a $100,000 bond.

On May 13, 1998, SDC filed a Motion for Voluntary Dismissal. Smith refused to consent to a dismissal of the case for fear that his rights under 11 U.S.C. § 303(i) [1] to seek costs, attorney's fees, and damages would be waived. Before the Court ruled on the dismissal motion, Smith filed the instant motion seeking the recovery of fees, expenses, and damages from SDC. By Order entered July 10, 1998, the Court dismissed the involuntary petition, but retained jurisdiction to consider Smith's request for fees and damages under § 303(i).

## ISSUES PRESENTED

■■■ At issue in this controversy is (1) whether SDC had standing to file the involuntary petition; (2) whether Smith was generally paying his debts as they became due; and (3) whether SDC filed the involuntary petition in bad faith.[2] Bearing these issues in mind, the Court will carefully scrutinize SDC's actions as "the filing of an involuntary petition is an extreme remedy with serious consequences to the alleged debtor, such as loss of credit standing, inability to transfer assets and carry on business affairs, and public embarrassment." *In re Reid,* 773 F.2d 945, 946 (7th Cir.1985); *see also In re Dino's,* 183 B.R. 779, 783–84 (S.D.Ohio 1995) ("the danger of involuntary bankruptcy cannot be overlooked by the courts;" an involuntary petition is a charge that "ought not be made lightly"); *In re SBA Factors of Miami, Inc.,* 13 B.R. 99, 101 (Bankr.S.D.Fla.1981). Having defined the issues and having noted the potential consequences of an involuntary case, the Court observes that the goal or purpose of an involuntary filing should be the equal distribution of assets among creditors. *In re Arker,* 6 B.R. 632, 636 (Bankr.E.D.N.Y.1980); *cf. In re Central Hobron Assoc.,* 41 B.R. 444, 452 (D.Haw.1984) (providing a fresh start to debtors and ensuring the orderly ranking of creditors' claims are the policy reasons behind the bankruptcy system).

## APPLICABLE STATUTE

Involuntary petitions in bankruptcy are governed by § 303, which provides in pertinent part:

(b) An involuntary case against a person is commenced by the filing ...

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute ..., if such claims aggregate at least $10,775 ...; or

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person ..., by one or more of such holders that hold in the aggregate at least $10,775 of such claims;

\* \* \* \* \* \*

(h) ... after trial, the court shall order relief against the debtor in an involuntary case ..., only if—

(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute ....;

\* \* \* \* \* \*

(i) If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

(1) against the petitioners and in favor of the debtor for—

(A) costs; or

(B) a reasonable attorney's fee; or

---

**1.** Hereafter, unless otherwise indicated, all statutory references are references to Title 11 of the United States Code.

**2.** The Court has been called upon to determine the propriety of the filing of the involuntary petition. Frank C. Steinemann, Jr., Chairman of SDC, Ronald R. Day, SDC's Executive Vice President, Louis Levenson, SDC's state court counsel, and Richard D. Ellenberg, SDC's bankruptcy counsel, appeared in this matter on behalf of SDC. It is the conduct and decisions of these four men that Smith has called into question.

(2) against any petitioner that filed the petition in bad faith, for—

 (A) any damages proximately caused by such filing; or

 (B) punitive damages.

11 U.S.C. § 303. To summarize the relevant portions of the statute, if the alleged debtor has twelve or more eligible creditors, an involuntary petition may be filed by three creditors which hold claims against the alleged debtor that are not contingent as to liability or the subject of a bona fide dispute. If the alleged debtor has fewer than twelve creditors holding claims that are not contingent as to liability or the subject of a bona fide dispute, one such creditor may file an involuntary petition. Regardless of the number of petitioning creditors, the amount of the petitioning creditors' claims must total $10,775.[3] Assuming the petitioning creditors have standing to file a petition, relief is appropriate only if the alleged debtor is generally not paying his debts as they become due. However, debts which are subject to a bona fide dispute are not considered in the "generally not paying" analysis. Further, legal fees and expenses may be awarded to the alleged debtor if the case is dismissed. Damages may be imposed against the petitioning creditors upon a finding that the involuntary petition was filed in bad faith.

### BACKGROUND AND DISCUSSION

*I. Origin of SDC's Claim Against Smith*

Smith has been a real estate developer/broker in the Atlanta metropolitan area for the past twenty-five (25) years. (Tr. at 45, ll. 15–22). Frank C. Steinemann, Jr. ("Steinemann"), is the Chairman of SDC. (Tr. at 188, ll. 17–18). Steinemann is likewise a real estate developer. (Tr. at 190, ll. 1–4).

In the Summer of 1995, Smith was under contract to purchase certain property in Fulton County located near Georgia 400 and Northridge Drive (hereinafter "Northridge Property"). (Tr. at 125, l. 23—p. 126, l. 1). Smith's and Steinemann's paths crossed in June of 1995 when Smith approached Steinemann about financing the Northridge Property transaction. (Tr. at 125, l. 23—p. 126, l. 15).

Smith and SDC reached a financing agreement ("Agreement") with respect to the Northridge Property transaction, which was executed on June 29, 1995. (SDC Ex. 1). The deal called for SDC to (i) accept an assignment of the purchase rights to the Northridge Property and (ii) pay $1.3 million towards the purchase of the Northridge Property. (SDC Ex. 1, ¶ 1; Tr. at 233, l. 20—p. 235, l. 12). Further, SDC agreed to sell the Northridge Property back to Smith for $1.3 million, plus a predetermined profit amount, which turned out to be $175,000. (SDC Ex. 1, ¶ 2; Tr. at 233, l. 20—p. 235, l. 12; Tr. at 236, ll. 3–9). To further sweeten the deal for SDC, Smith granted SDC the right to receive an assignment of an option to purchase another piece of property known as the Club Drive Property. (SDC Ex. 1, ¶ 3; Tr. at 127, ll. 2–17; Tr. at 233, l. 20—p. 235, l. 12).[4] In essence, the deal was structured in such a way that SDC could either take the profit from the increased purchase price of the Northridge Property ($175,000) or accept the assignment of the Club Drive Property.

Prior to financing the transaction, SDC received from Smith what was labeled a personal financial statement. (SDC Ex. 2). As of May 31, 1995, Smith represented

---

3. Pursuant to 11 U.S.C. § 104(b), the dollar amount provided for in § 303(b) is subject to periodic adjustment. On April 1, 1998, the $10,000 threshold was raised to $10,775. Since the case at bar was filed after the effective date of April 1, 1998, the amount that controls this case is $10,775.

4. The option to purchase the Club Drive Property was actually owned by American Investment Management, Inc., Smith's wholly owned company. Nonetheless, Smith was in control of the rights to purchase the Club Drive Property. (Tr. at 127, ll. 18—20).

his net worth to be in excess of $7.4 million. (Id.). Paragraph seven of the Agreement provides in pertinent part:

As a material inducement to Steinemann to enter into the transaction contemplated by this Agreement and upon which it is stipulated that Steinemann is reasonably relying, Smith hereby warrants, represents and agrees as follows:

(j) All information provided by Smith to Steinemann related to the Property, the Pinetree Deal and the Club Drive Deal is accurate to his knowledge and belief and does not omit any material fact known by Smith or believed by Smith to exist.

(k) The financial statement of Smith dated as of May 31, 1995 delivered this date to Steinemann is true and accurate as of this date.

(SDC Ex. 1, ¶ 7). At trial, Smith admitted making the foregoing representations. (Tr. at 124, l. 9—p. 125, l. 13). Smith also made the following representation in paragraph five of Exhibit E to the Agreement:

Smith warrants and represents to Steinemann and to FCS that no other person or entity has any interest in the Club Drive Purchase Contract or any similar right to obtain an interest in the Club Property by, through or under AIM or Smith (including, without limitation, any rights of JPI, which Smith warrants have expired) and agrees to defend, indemnify and hold harmless FCS and Steinemann from and against any claim, liability, loss expense, including without limitation, attorneys fees, arising out of or related to the existence or assertion of any such interest or right.

(SDC Ex. 1, Exhibit E, ¶ 5).

As per the Agreement, SDC purchased the Northridge Property and then transferred it back to Smith on August 14, 1995. (Tr. at 236, ll. 13–17). However, sometime prior to August 14, 1995, an entity known as Jefferson Creek Associates, Ltd. ("Jef-

ferson Creek"), asserted rights in the Club Drive Property and filed a complaint against Smith and SDC in the Superior Court of Gwinnett County. (SDC Ex. 4; Tr. at 130, ll. 1–11). Jefferson Creek also filed a *notice of lis pendens* on the Club Drive Property. (Tr. at 130, ll. 4–7; Tr. at 236, ll. 21–25; Tr. at 448, ll. 19–22). On August 14, 1995, Smith paid SDC $1.3 million. (SDC Ex. 3; Tr. at 237, ll. 13–21). As previously mentioned, SDC had the option of either receiving an additional $175,000 as profit for financing the Northridge Property transaction or accepting assignment of the Club Drive Property. Due to the presence of the *notice of lis pendens* on the Club Drive Property, SDC opted for the lump sum payment of $175,-000. (Tr. at 236, l. 18—p. 237, l. 12). Smith did not have $175,000 to pay to SDC. (Tr. at 237, ll. 13–21; Tr. at 448, l. 23—p. 449, l. 13).

Not that it had much choice, and based on Smith's reaffirmation of the warranties and representations that he made in paragraph five of Exhibit E to the Agreement, SDC reluctantly exercised the Club Drive Property option. (SDC Ex. 3; Tr. at 238, ll. 12–18). A Memorandum of Understanding signed by Smith and SDC on August 14, 1995, contained the following provision:

Notwithstanding the claims of Jefferson Creek Associates, L.P., the parties acknowledge and reaffirm that the representation, warranty and indemnity obligations of David L. Smith under Paragraph 5 of *Exhibit "E"* of the Agreement shall survive consummation of the Assignment and the closing of the sale of the "Property" (as defined in the Agreement) of even date herewith pursuant to the Agreement.

(SDC Ex. 3, ¶ 2).

Meanwhile, Smith and SDC retained separate counsel to defend the lawsuit filed by Jefferson Creek.[5] From August 31,

---

5. Initially, Smith proposed that his counsel, David Flint, represent both him and SDC in the state court litigation with Jefferson Creek. (Tr. at 135, ll. 15–22). However, the lawyers

1995, through April 3, 1996, SDC made at least six written requests to Smith that he honor his indemnity obligations under the Agreement by paying SDC's legal fees in the Jefferson Creek litigation. (SDC Exs. 7, 8, 11, 12, 13, & 19). Smith acknowledged receiving SDC's correspondence. (Tr. at 136, ll. 16–17; Tr. at 137, ll. 1–2; Tr. at 137, ll. 13–20; Tr. at 148, ll. 21–22). By letters dated February 15, and February 27, 1998, Smith informed Ronald R. Day, SDC's Executive Vice President ("Day"), that he would honor his indemnity, provided that SDC would supply him billing statements for legal fees that Smith paid as part of the August 14th Northridge Property closing. (SDC Exs. 17 & 18). Day refused to provide Smith the requested billing statements as SDC considered the fees incurred as part of the August 14th closing to be unrelated and irrelevant to Smith's obligation to indemnify SDC in the Jefferson Creek lawsuit. (SDC Ex. 19; Tr. at 465, ll. 2–19).

As a result of Smith's failure to pay SDC's legal fees in the Jefferson Creek matter, SDC sued Smith in the State Court of Fulton County. (Tr. at 465, ll. 20–23).[6] Smith filed a counterclaim against SDC based on fraud. (Tr. at 66, ll. 17–19). On January 19, 1997, the trial court entered an order granting partial summary judgment to SDC. (SDC Ex. 5). Relevant portions of the State Court of Fulton County's order are reproduced in their entirety: [7]

> SDC has denied, and continues to deny, the validity of the claims asserted by Jefferson Creek. Nevertheless, Jefferson Creek has asserted such claims, and, continues to assert such claims in the Gwinnett County action, as a result of which SDC has been forced to pay (and

continues to pay) costs and expenses of litigation, including attorneys fees.

Because Jefferson Creek filed a *lis pendens* against the property, SDC has incurred and continues to incur damages because of its inability to develop or otherwise make use of the Club Drive Property.

Pursuant to the terms of paragraph 5 of Exhibit E of the Smith–SDC Contract, SDC requested that Smith honor its agreement to indemnify SDC for all costs and expenses connected with this litigation. Following demand, Smith admitted that he is legally obligated for such costs and expenses but has nonetheless failed to pay the same.

In addition to the cost of defending the Gwinnett County action, SDC has incurred additional losses because of the assertion of the claims by Jefferson Creek. Such losses and damages include, but are not limited to, the cost of interest carry on the Club Drive Property resulting from the loss of use of the Club Drive Property, which has been forestalled by the *lis pendens* filed against the Property. Under the terms of the indemnification agreement, Smith is liable to SDC for *all losses and damages* caused by the Jefferson Creek claims, which includes this cost of interest carry.

SDC has thus far incurred legal fees and expenses in connection with the Gwinnett County action in the amount of $156,192.14 through October, 1996; the amount incurred is not disputed by Defendant Smith.

SDC's interest carry cost on the Club Drive property through August 1996, is claimed to total $237,480.00; said amount is disputed by Defendant and is therefore subject to proof at trial, as is

---

for both Smith and SDC quickly realized that the parties needed separate representation. (SDC Ex. 7).

**6.** SDC alleged that Smith breached the Agreement and that Smith executed a fraudulent financial statement. (Tr. at 214, ll. 21–25).

**7.** The paragraph numbers contained in the order have been omitted.

the amount of other damages claimed by Plaintiff.

WHEREFORE, the Court further makes and enters the following

\* \* \* \* \* \*

A. There is no genuine issue as to any material fact on the issue of Defendant's liability to Plaintiff pursuant to the aforesaid indemnification provisions; and

B. There is no genuine issue as to any material fact on the issue of the amount of attorney's fees and costs of litigation thus far incurred by Plaintiff for which Defendant is liable; and

C. Plaintiff is entitled to a Judgment as a matter of law on the issue of Defendant's liability, and for the amount of damages thus far incurred for attorney's fees and costs of litigation.

THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff's Motion for Partial Summary Judgment be and the same hereby is *granted* in part:

Plaintiff Steinemann Development Corporation shall have and recover from Defendant David L. Smith the sum of $156,192.14, plus interest at the legal rate until paid in full; and, further, Defendant is liable to Plaintiff on the cause of action alleged in the Complaint filed herein, and all remaining issues regarding additional damages shall be reserved for ruling by the Court or tried as required by law.

(SDC Ex. 5, ¶¶ 5–10 & Conclusion). In summary, the court found Smith liable under the Agreement's indemnification provisions for SDC's litigation costs, which totaled $156,192.14 through October, 1996. The court likewise found Smith liable for the cost of interest carry on the Club Drive Property in an amount subject to proof at trial.

Smith appealed the order entered by the State Court of Fulton County. By order entered February 5, 1998, the Court of Appeals of Georgia affirmed the trial court in part, reversed the trial court in part, and remanded. The Court of Appeals of Georgia opined:

> According to Smith, he "has squarely denied liability under the indemnity agreement through his answer and affirmative defenses and his response to [SDC's] statement of undisputed facts." However, Smith cannot rest upon the mere allegations or denials of his pleadings. He has failed to come forward with any evidence showing that his affirmative defenses are meritorious or that there is a genuine issue for trial. He failed to provide the trial court with any evidence contesting the fact, execution, validity or enforceability of the contract containing the indemnity provision. Thus, whether Smith admitted liability or not, the trial court did not err in finding him liable under the indemnity provision of the contract. A trial court's ruling, right for any reason, will be affirmed on appeal. *Keith v. Alexander Underwriters & c.,* [sic] 226 Ga.App. 838, 840(1) (487 S.E.2d 673) (1997).

> Smith further asserts that the trial court erred in concluding that he did not dispute the amount of legal fees and expenses sought by SDC. We agree. The trial court's judgment as to the amount of legal fees and expenses is vacated, and the case is remanded for further proceedings.

> In paragraph 9 of his order, the trial judge stated that the amount of legal fees and expenses incurred by SDC is not disputed by Smith. He then entered judgment against Smith for the sum set forth by SDC. However, both Smith and his attorney submitted affidavits contesting the reasonableness of the legal fees and expenses sought by SDC. Therefore, the trial court's judgment must be reversed and the case remanded so that the amount of legal fees and expenses may be proven at trial.

(SDC Ex. 6, pp. 5–6). Thus, despite its finding that Smith is liable under the Agreement's indemnity provisions, the

Court of Appeals of Georgia reversed the trial court's judgment as to the amount of the legal fees. The matter was remanded so that the legal fees and expenses could be quantified by a jury.

*II. As of the Filing Date, Did SDC Hold a Claim Against Smith That Was Not Contingent as to Liability?*

█ The Court must determine whether SDC had standing to file the involuntary petition. The first element of standing under § 303(b) concerns whether SDC held a claim on April 8, 1998, that was not contingent as to liability. *See* 11 U.S.C. § 303(b)(1). The term "claim" is broadly defined in the Bankruptcy Code as a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." 11 U.S.C. § 101(5)(A). Thus, any person or entity that has a "right to payment" satisfies the first requirement of § 303(b)(1), provided the claim is not contingent as to liability. *In re All Media Properties, Inc.,* 5 B.R. 126, 131 (Bankr.S.D.Tex.1980), *aff'd* 646 F.2d 193 (5th Cir.1981). In *All Media Properties,* the court enunciated the following standard for determining whether a claim is contingent as to liability:

> A claim is contingent as to liability if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event and such future occurrence was within the actual or presumed contemplation of the parties at the time the original relationship of the parties was created. On the other hand, if a legal obligation to pay arose at the time of the original relationship, but that obligation is subject to being avoided by some future event or occurrence, the claim is not contingent as to liability, although it may be disputed as to liability for various reasons.

*Id.* at 133; *see also Subway Equip. Leasing Corp. v. Sims (In re Sims),* 994 F.2d 210, 220 (5th Cir.1993), *cert. denied,* 510 U.S. 1049, 114 S.Ct. 702, 126 L.Ed.2d 669 (1994); *Chicago Title Ins. Co. v. Seko Inv., Inc. (In re Seko Inv., Inc.),* 156 F.3d 1005, 1008 (9th Cir.1998) (claim is contingent as to liability when debtor's duty to pay arises only upon occurrence of future event that was contemplated by parties at time of contract execution); *In re Taylor & Assoc., L.P.,* 193 B.R. 465, 475 (Bankr. E.D.Tenn.1996) (" 'When all the events have occurred which allow a court to adjudicate a claim and determine whether or not payment should be made, there is no contingency concerning the claim itself, unless "it is apparent, to a legal certainty," that the petitioning creditor would be unable to obtain a judgment against the debtor upon adjudication of its claim.' ") (citing *In re Longhorn 1979–II Drilling Program,* 32 B.R. 923, 927 (Bankr.W.D.Okla.1983)).

In the present case, Smith's liability under the Agreement was established by the trial court and affirmed by the Court of Appeals of Georgia. (SDC Exs. 5 & 6). Paragraph 5 of Exhibit E to the Agreement provides that "Smith ... agrees to defend, indemnify and hold harmless FCS and Steinemann from and against any claim, liability, loss expense, including without limitation, attorneys fees, arising out of or related to the existence or assertion of any such interest or right." (SDC Ex. 1, Exhibit E, ¶ 5). It is this Court's view that the liability-triggering event occurred when Jefferson Creek filed suit against SDC and asserted rights in the Club Drive Property. Based on the standards set forth in *All Media Properties, Sims,* and *Seko Inv., Inc.,* the Court concludes that SDC held a claim against Smith on the filing date that was not contingent as to liability.

*III. As of the Filing Date, Did SDC Have a $10,775 Claim That Was Not the Subject of a Bona Fide Dispute?*

█ Whether SDC's claim against Smith was the subject of a bona fide dispute is the second element of standing.

*See* 11 U.S.C. § 303(b)(1).[8] The vast majority of courts that have interpreted "subject to a bona fide dispute" have adopted the standard articulated in *In re Lough*, 57 B.R. 993 (Bankr.E.D.Mich.1986):

> The legislative history makes it clear that Congress intended to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal. Congress plainly did not intend to require a debtor to pay a legitimately disputed debt simply to avoid the stigma of bankruptcy. **Accordingly, if there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts, then the petition must be dismissed.**

57 B.R. at 997 (emphasis added). In *Matter of Busick*, 831 F.2d 745, 750 (7th Cir. 1987), the Seventh Circuit adopted the *Lough* standard, but added the following refinement:

> Under [the *Lough* ] standard, the bankruptcy court must determine whether there is an **objective basis** for either a factual or a legal dispute as to the validity of debt. However, "[t]he statute does not require the court to determine the outcome of any dispute, only its presence or absence. Only a limited analysis of the claims at issue is necessary."

*Busick*, 831 F.2d at 750 (quoting *In re Busick*, 65 B.R. 630, 637 (N.D.Ind.1986)) (emphasis added). The *Lough/Busick* standard has been embraced by every circuit court that has confronted the "subject to bona fide dispute" issue. *See Sims*, 994 F.2d at 220–21; *Rimell*, 946 F.2d at 1365; *B.D.W. Assoc., Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65, 66–67 (3rd Cir. 1989); *Bartmann v. Maverick Tube*, 853 F.2d at 1543–44.[9] This Court adopts the *Lough/Busick* test for determining the existence of a bona fide dispute.

■ Application of the test to the instant case requires SDC, here the nonmoving party, to establish a prima facie

8. The term "subject to a bona fide dispute" is not defined in the Bankruptcy Code. *Rimell v. Mark Twain Bank (In re Rimell)*, 946 F.2d 1363, 1365 (8th Cir.1991), *cert. denied*, 504 U.S. 941, 112 S.Ct. 2275, 119 L.Ed.2d 202 (1992); *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1543 (10th Cir.1988). However, a dispute is nothing more than a disagreement. Webster's New Collegiate Dictionary defines the term "bona fide" as "made in good faith without fraud or deceit." WEBSTER'S NEW COLLEGIATE DICTIONARY 124 (1979). Thus, it would seem that a bona fide dispute is a disagreement grounded in good faith (and good faith necessarily implies an absence of fraud or deceit).

9. The *Lough/Busick* standard is favored by the lower courts as well. *See In re Eastown Auto Co.*, 215 B.R. 960, 963 (6th Cir. BAP 1998); *Remex Electronics, Ltd. v. Axl Indus., Inc. (In re Axl Indus., Inc.)*, 127 B.R. 482, 485 (S.D.Fla.1991), *aff'd in part, appeal dismissed in part*, 977 F.2d 598 (11th Cir.1992); *Sipple v. Atwood (In re Atwood)*, 124 B.R. 402, 407–08 (S.D.Ga.1991); *In re IMI Acquisition of Boca Raton Corp.*, 221 B.R. 35, 38 (Bankr. S.D.Fla.1998); *In re Manhattan Indus., Inc.*, 224 B.R. 195, 199 (Bankr.M.D.Fla.1997); *In re Audio Visual Workshop, Inc.*, 211 B.R. 154, 157–158 (Bankr.S.D.N.Y.1997); *In re Mavel-*

*lia*, 149 B.R. 301, 305 (Bankr.E.D.N.Y.1991); *In re Norriss Bros. Lumber Co. Inc.*, 133 B.R. 599, 603–05 (Bankr.N.D.Tex.1991); *In re Kujawa*, 112 B.R. 968, 971 (Bankr.E.D.Mo. 1990); *In re Caucus Distrib., Inc.*, 106 B.R. 890, 917 (Bankr.E.D.Va.1989); *In re Leach*, 92 B.R. 483, 487–88 (Bankr.D.Kan.1988), *amended by* 102 B.R. 805 (Bankr.D.Kan. 1989); *In re Gen. Trading, Inc.*, 87 B.R. 216, 219 (Bankr.S.D.Fla.1988); *In re Braten*, 86 B.R. 340, 343 (Bankr.S.D.N.Y.1988); *In re Ramm Indus., Inc.*, 83 B.R. 815, 822 (Bankr. M.D.Fla.1988); *In re B.B.S.I., Ltd.*, 81 B.R. 227, 230 (Bankr.E.D.N.Y.1988); *In re Garland Coal & Mining Co.*, 67 B.R. 514, 521 (Bankr.W.D.Ark.1986). *Compare In re Stroop*, 51 B.R. 210, 212 (D.Colo.1985) (test for determining whether claim is subject to a bona fide dispute is the summary judgment standard: if the alleged debtor's defense to petitioning creditor's claim raises material issues of fact or law such that judgment could not have been granted as a matter of law in favor of the creditor, the claim is subject to a bona fide dispute); *In re Cates*, 62 B.R. 179, 181 (Bankr.S.D.Tex.1986) (adopting *Stroop* ); *In re Johnston Hawks, Ltd.*, 49 B.R. 823, 830–31 (Bankr.D.Haw.1985) (utilized a four-part test to determine existence of a bona fide dispute and focused on whether alleged debtor's claims and defenses asserted in good faith).

case that no bona fide dispute existed on the filing date. *Rimell*, 946 F.2d at 1365; *Bartmann v. Maverick Tube*, 853 F.2d at 1544. If SDC establishes a prima facie case, the burden then shifts to Smith to present evidence that SDC's claim was the subject of a bona fide dispute. *Id.* In this analysis, the Court is mindful that it is not required to resolve the underlying dispute between Smith and SDC; the Court's obligation is to objectively "identify [the dispute's] presence for the purpose of including or eliminating the creditor from the count of petitioning creditors." *Caucus Distrib., Inc.*, 106 B.R. at 917; *see also Mavellia*, 149 B.R. at 305 ("court may be required to conduct a limited analysis of the legal issues in order to ascertain whether an objective legal basis for the dispute exists"); *In re Ramm Indus., Inc.*, 83 B.R. 815, 822 (Bankr.M.D.Fla.1988).

Smith has been found liable pursuant to the Agreement's indemnification provisions. (SDC Exs. 5 & 6). Specifically, Smith agreed to indemnify SDC "from and against any claim, liability, loss expense . . . [and] attorneys fees" in the event Jefferson Creek asserted an interest or rights in the Club Drive Property. (SDC Ex. 1, Exhibit E, ¶ 5). Initially, SDC estimated that its fees and expenses in the Jefferson Creek litigation would range from $600,000 to $900,000. (Petitioner's Supplemental Allegations ¶ 3, April 8, 1998). At trial, Day testified that SDC's total damages, including attorneys' fees, interest on the attorneys' fees, interest carry on the land, and real estate taxes will likely exceed $900,000. (Tr. at 413, l. 1—p. 420, l. 6; Tr. at 423, ll. 12–22; Tr. at 439, l. 2—p. 441, l. 16).[10] There is no doubt that SDC settled the Jefferson Creek litigation on February 11, 1997, by paying $100,000 to JPI Investment Co., LP, an affiliate of Jefferson Creek. (SDC Exs. 20 & 70). Based on the Agreement, the finding of Smith's liability by the Court of Appeals of Georgia, Day's testimony as to SDC's estimated expenses, and the documentary evidence introduced at trial, the Court concludes that SDC has established a prima facie case that no bona fide dispute exists with respect to its claim. Such being the case, Smith has the burden of establishing that SDC's claim was subject to a bona fide dispute. *Rimell*, 946 F.2d at 1365; *Bartmann v. Maverick Tube*, 853 F.2d at 1544.

 Smith has made it abundantly clear throughout this proceeding that he disputes the amount of SDC's damages in the state court action. The Court has learned that Smith filed a $52,000 counterclaim against SDC for fraud. (Tr. at 66, l. 8—p. 67, l. 2). Smith contends that "there is a bona fide dispute as to every dollar claimed by SDC." (Brief in Support of Smith's Motion for Directed Verdict, and for Recovery of Fees, Expenses, and Actual and Punitive Damages Against Petitioner Steinemann Development Company at 11, June 10, 1998). Further, Smith contends that "the Georgia Court of Appeals

10. Evidently, SDC claimed in state court summary judgment pleadings that (1) its legal fees in the Jefferson Creek litigation through October, 1996, totaled at least $156,192.14 and (2) the interest carry cost on the Club Drive Property through August, 1996, totaled at least $237,480, else the trial court would not have included those figures in its order. Nonetheless, by letter dated November 1, 1995, Day requested that Smith pay $12,566.90 in legal fees. (SDC Ex. 11). By letter dated November 16, 1995, Day again requested payment of the $12,566.90 of fees, plus an additional $5,592.50. (SDC Ex. 12). On April 3, 1996, Day requested in writing payment of almost $75,000 in accrued legal fees. (SDC Ex. 19). Smith introduced an exhibit at trial which reflects SDC's payment of $227,201.78 to the law firm of Doffermyre, Shields, Canfield & Knowles for the period September 7, 1995, through March 10, 1997; SDC's payment of $18,899.69 to the law firm of Morris, Manning & Martin for the period August 14, 1995, through May 1, 1997; and SDC's payment of $78,804.99 to the law firm of Keegan Federal & Associates for the period April 1, 1996, through January 8, 1998. (Smith Ex. 65). Smith Ex. 65 refers to SDC's billings and payments for the "Smith/JPI Litigation" and the sum of the various amounts billed and paid is $435,269.75. (Id.). The point is that all of the combined letters and exhibits reflect that SDC has incurred thousands of dollars in legal fees defending Jefferson Creek's lawsuit.

held that SDC's claims were subject to a bona fide dispute."[11] (Post–Trial Brief in Support of Smith's Motion for Recovery of Fees, Expenses, and Actual and Punitive Damages Against Petitioner Steinemann Development Corporation; for Imposition of Sanctions Pursuant to Federal Rule of Bankruptcy Procedure 9011; and for Imposition of Sanctions Against Steinemann Development Corporation for Willful Violation of Automatic Stay at 5, November 24, 1998). "There is ... a fundamental difference between a dispute based solely on the contentious nature of a litigant and a bona fide dispute." *Garland Coal & Mining Co.*, 67 B.R. at 521. Smith's denial of both the validity and amount of SDC's claim and his filing of a counterclaim in the state court matter is insufficient for the Court to conclude that a bona fide dispute exists. *Efron v. Gutierrez*, 226 B.R. 305, 313 (D.P.R.1998); *In re Tampa Chain Co., Inc.*, 35 B.R. 568, 576–77 (Bankr.S.D.N.Y. 1983) (debtor's refusal to concede the validity or amount of creditor's claim, without more, is insufficient to defeat creditor's standing as a § 303(b)(1) claimant; otherwise, debtor could avoid an involuntary petition by simply disputing the amount of the claim); *cf. In re Broadview Lumber Co., Inc.*, 137 B.R. 775, 776 (Bankr. W.D.Mo.1992) (to defeat involuntary petition, there must be a bona fide dispute as to the validity of the entire claim, not just a portion thereof). Similarly, that Smith and SDC have been involved in extensive litigation for three years does not, in and of itself, establish the existence of a bona fide dispute. *Mavellia*, 149 B.R. at 305 (citing *In re Drexler*, 56 B.R. 960 (Bankr. S.D.N.Y.1986)). Furthermore, under the *Lough/Busick* test, the Court can not focus on Smith's subjective belief that SDC's claim was subject to a bona fide dispute as of the filing date. *Mavellia*, 149 B.R. at 305. Rather, the Court "must determine whether there is an objective basis for either a factual or a legal dispute as to the validity of debt." *Busick*, 831 F.2d at 750.

After evaluating the evidence presented with respect to the Jefferson Creek litigation and the Smith/SDC litigation, the Court concludes that SDC had a sizable claim against Smith that was not subject to bona fide dispute. To summarize the evidence, Smith represented to SDC that Jefferson Creek did not have an interest in the Club Drive Property. Smith agreed to indemnify SDC and pay its attorneys' fees in the event Jefferson Creek asserted an interest in the subject property. Not only did Jefferson Creek assert an interest in the Club Drive Property, it also filed an eight count complaint against SDC to protect that interest.[12] In defending the lawsuit, SDC incurred legal fees and expenses. From August 31, 1995, to April 3, 1996, SDC made numerous oral and written demands to Smith that he honor the Agreement's indemnity provisions. Smith declined the repeated requests. SDC eventually sued Smith for breach of the indemnity agreement. The Court of Appeals of Georgia has determined that Smith is liable to SDC for its legal fees and expenses in an amount yet to be determined.

█ After fifteen (15) months of complex litigation and a seven-day jury trial, SDC settled the Jefferson Creek litigation

---

11. The Court takes issue with Smith's interpretation of the decision rendered by the Court of Appeals of Georgia. The appeals court did not hold that SDC's claims against Smith were the subject of a bona fide dispute. The term "bona fide dispute" does not appear anywhere in the opinion. What the appeals court held was that the amount of SDC's legal fees and expenses is subject to dispute.

12. In its Third Amended Complaint filed on or about November 13, 1995, Jefferson Creek sought (i) a declaratory judgment; (ii) specific performance of a contract; (iii) injunctive relief; (iv) damages for breach of contract; (v) damages for tortious interference of a contract; (vi) damages for breach of duty of good faith and fair dealing; (vii) the imposition of a constructive trust on the Club Drive Property as a result of a fraudulent transfer; and (viii) damages based on a conspiracy between Smith and SDC. (SDC Ex. 4).

for $100,000.[13] In this day and age, complex commercial litigation which culminates in a week long trial costs thousands and thousands of dollars in legal fees. Under the indemnity, Smith is obligated to pay SDC's fees. It is pure fantasy, in light of the appeals court's finding of liability, for Smith to think that he will walk away from the Fulton County litigation owing SDC nothing. "A dispute as to the amount of a claim does not negate its existence if the legal obligation to pay is present." *In re Braten*, 74 B.R. 1021, 1023 (Bankr.S.D.N.Y.1987) (citations omitted). From the Court's objective viewpoint, it is a foregone conclusion that as of April 8, 1998, SDC had a claim against Smith that exceeded $10,775 in amount and that was not subject to bona fide dispute.[14] *See Bartmann v. Maverick Tube*, 853 F.2d at 1544 ("although a claim might not be provable, it still may be sufficient to confer standing on a petitioning creditor").

*IV. As of the Filing Date, Did Smith Have Less Than Twelve Creditors With Aggregate Claims of at Least $10,775, Which Were Not Contingent as to Liability or the Subject of a Bona Fide Dispute?*

 As the sole petitioning creditor, SDC has the burden of proving that Smith had less than twelve qualifying creditors as of the filing date. *Atlas Machine & Iron Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d 709, 715–16 (4th Cir. 1993); *In re Knoth*, 168 B.R. 311, 312 (Bankr.D.S.C.1994). As noted by the Fifth Circuit, the policy reasons for the three creditor requirement are "the fear that

involuntary bankruptcy might be used by one or two recalcitrant creditors as a means of harassing an honest debtor and the possibility that the threat of an involuntary petition would be used to compel the debtor to make preferential payments to one or more litigious creditors." *Subway Equipment Leasing Corp. v. Sims (In re Sims)*, 994 F.2d 210, 220 (5th Cir.1993), *cert. denied*, 510 U.S. 1049, 114 S.Ct. 702, 126 L.Ed.2d 669 (1994) (quoting COLLIER ON BANKRUPTCY, ¶ 303.08[12][a], at 303–42 (1993)). "The three creditor requirement is not a meaningless formality that a creditor may ignore until after filing the involuntary petition. While an involuntary petition may be cured after filing when a single creditor files in good faith believing the debtor has fewer than twelve creditors, a single creditor may not file an involuntary petition knowing the debtor has twelve or more creditors." *Basin Electric Power Cooperative v. Midwest Processing Co.*, 769 F.2d 483, 486 (8th Cir.1985), *cert. denied*, 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986).

*A. SDC's Pre–Filing Investigation of the Number of Smith's Creditors*

Richard Ellenberg ("Ellenberg") was hired to advise SDC as to the filing requirements of an involuntary bankruptcy petition. (Tr. at 468, ll. 6–9). Ellenberg's investigation of the number of Smith's creditors was conducted for the most part from February 23, to February 27, 1998. (Tr. at 488, ll. 12–25). Ellenberg's inquiry consisted primarily of the following:

---

**13.** All the while, and due to the *notice of lis pendens* filed of record, SDC was unable to transfer or develop the Club Drive Property.

**14.** The Court acknowledges that it does not know the precise amount of SDC's claim. However, SDC ultimately settled Jefferson Creek's claim for $100,000, an amount far greater than $10,775. Further, it is telling that from July, 1995, through July 1997, Smith's attorneys billed $128,286.15 for representing him in the Jefferson Creek litigation. (SDC Ex. 43). The Court is cognizant of Smith's counterclaim against SDC which

arises out of the Northridge Property transaction. According to the settlement statement for that transaction, Smith paid SDC $51,-971.12 for "Reimbursement of Seller's Expenses." (SDC Ex. 3). Smith complains that SDC defrauded him out of some legal fees through the use of bogus billing statements. (Tr. at 66, l. 19—p. 67, l. 2). Even if Smith's assertions in this regard are true and approximately $52,000 is deducted from SDC's claim, the Court is of the opinion that SDC's claim would still be much larger than $10,775.

(1) his review of Smith's December, 1997, and February, 1998, credit reports, (Tr. at 473, ll. 5–10; Tr. at 475, ll. 22–25);

(2) a conversation with John Sherrill, counsel for Canterbury Square, regarding pending litigation between Smith and Canterbury Square, (Tr. at 473, ll. 12–16);

(3) conversations with unidentified other attorneys "who were involved with Smith," (Tr. at 473, ll. 16–22);

(4) his review of the docket of a partnership involuntary bankruptcy case in which Smith was involved in the Middle District of Georgia and conversations with two or three attorneys about the case, (Tr. at 473, l. 23—p. 474, l. 5);

(5) conversations with Steinemann, Day, Louis Levenson, and SDC's controller about Smith and SDC's claim against Smith, (Tr. at 474, ll. 5–20);

(6) a conversation with a Terry Hictor regarding litigation between Smith and Hal Whitman, (Tr. at 474, ll. 13–15); and

(7) his review of numerous documents, including bank statements for Smith and some of his companies, depositions, discovery responses, and a private investigator's report on Smith, (Tr. at 474, l. 20—p. 475, l. 21).

Ellenberg testified that his pre-filing investigation revealed seven creditors with qualifying claims against Smith.[15] (Tr. at 528, ll. 17–21). Of the seven creditors Ellenberg discovered, five held credit card claims, one was the claim of SDC, and the other was the claim of Tom Turrentine ("Turrentine").[16] (Id.). Thus, based on his pre-filing inquest, Ellenberg determined that a single petitioning creditor case was warranted since Smith had fewer than twelve creditors with claims not contingent as to liability or subject to a bona fide dispute.[17]

### B. The Creditors as Identified by Smith and Their Eligibility as Petitioning Creditors

In accordance with Rule 1003(b) of the Federal Rules of Bankruptcy Procedure, Smith identified the following as his pre-petition creditors (with the amounts owed in parenthesis):

| | |
|---|---|
| Stonewood Investments ($12,000) | American Express Optima ($18,000) |
| Fidelity National Bank ($15,700) | American Express Corp. ($364) |
| Findley Chase, L.P. ($7,500) | American Express Platinum ($521) |
| Jackson Life Insurance ($1,719) | First Union Master Card ($12,276) |
| NationsBank Credit Line ($5,000) | First Bankcard MasterCard ($3,707) |
| Security Connecticut Ins. ($4,531) | Wachovia Visa ($17,128) |
| Thomas Turrentine ($46,650) | Bell South ($50) |
| Schreeder, Wheeler, and Flint ($45,000) | Media One, Inc. ($35) |
| Allmerica Life Insurance ($10,824) | Bronnie Smith ($309,000) |
| Allstate Auto Insurance ($730) | Steinemann Development Corp. (unknown) |
| Arrow Exterminators ($35) | Canterbury Square, L.L.C. (unknown). |

(SDC Ex. 21).[18] SDC contends that only nine of the above twenty-two (22) creditors should be considered qualifying creditors for purposes of § 303(b) (i.e., creditors with claims not contingent as to liability or subject to a bona fide dispute). According

---

**15.** Ellenberg testified further that he speculated that the Internal Revenue Service might have a claim. (Tr. at 480, l. 9—p. 485, l. 24; Tr. at 508, ll. 11–24). However, due to his uncertainty about the existence of a tax claim, Ellenberg did not consider the IRS a qualifying creditor. (Tr. at 508, ll. 11–24).

**16.** Turrentine and Smith are former business partners. (Tr. at 46, ll. 12–15). Turrentine holds a promissory note signed by Smith in the amount of $46,648.62. (Smith Ex. 1). At trial, much was made of Turrentine's note, the significance of which will be addressed *infra*.

**17.** The Court has learned that Louis Levenson, SDC's state court counsel ("Levenson"), had pre-filing information about two additional creditors that he did not provide to Ellenberg, the significance of which will be discussed *infra*.

**18.** Bronnie Smith, Smith's ex-wife, was added as a creditor by amendment dated August 7, 1998. Thus, her name does not appear on SDC Ex. 21.

to SDC, that Ellenberg uncovered only seven creditors is of no consequence since thirteen (13) of Smith's creditors were not eligible to serve as involuntary petitioners.[19] SDC conceded at trial that Fidelity National Bank, NationsBank Credit Line, First Union Master Card,[20] First Bankcard MasterCard, Wachovia Visa,[21] Turrentine, and Schreeder, Wheeler, and Flint were qualifying creditors. (Tr. at 21, l. 23—p. 23, l. 25; Tr. at 529, l. 6—p. 533, l. 20). On the other hand, SDC contends that Stonewood Investments, Findley Chase, L.P., Jackson Life Insurance, Security Connecticut Insurance, Allmerica Life Insurance, Allstate Auto Insurance, Arrow Exterminators, Bell South, MediaOne, Inc., Bronnie Smith, and Canterbury Square, L.L.C. should be excluded as qualifying creditors for one reason or another.[22] (Tr. at 21, l. 12—p. 25, l. 14; Tr. at 529, l. 6—p. 533, l. 20).

■ An issue arose at trial regarding the number of American Express creditors. SDC has conceded that American Express is a qualifying creditor. (Tr. at 23, ll. 14–17; Tr. at 531, ll. 10–20). However, SDC contends that despite the fact that Smith had three different American Express credit cards,[23] American Express should be counted only once. (Id.). Appearing at trial to testify was Robert Simpson, an American Express employee of eleven years. (Tr. at 407, ll. 12–13).

Simpson's uncontroverted testimony was that the three accounts were not issued and maintained by three separate American Express companies or legal entities. (Tr. at 404, l. 22—p. 405, l. 7; Tr. at 407, ll. 5–9). Rather, the sole creditor for all three accounts is American Express Travel Related Services Company, Inc.[24] (Id.). Based on the evidence, the Court concludes that American Express should be treated as one creditor for counting purposes.

■ *Stonewood Investments*—On April 5, 1998, three days before the petition was filed, Smith signed a $12,000 promissory note in favor of Stonewood Investments. (Smith Ex. 13; SDC Ex. 23). However, Stonewood Investments did not make the borrowed funds available to Smith until at least nine days after the petition was filed. (SDC Ex. 22). SDC contends, and the Court agrees, that Stonewood Investments did not have a claim against Smith on the petition date. "Claim" is broadly defined as a "right to payment." *See* 11 U.S.C. § 101(5). As of April 8th, Stonewood Investments could not have possibly had a "right to payment" against Smith since it had failed to perform under the note. As of April 8th, due to Stonewood Investments' failure to deliver the funds to Smith, the note represented a unilateral contract which lacked mutuality.[25] Ac-

19. Stated differently, SDC contends that, at all times relevant hereto, Smith never had twelve or more qualifying creditors.

20. Smith apparently had two credit card accounts with First Union. (Smith Exs. 8 & 9).

21. The evidence reflects that Smith actually had two visa cards with Wachovia. (SDC Exs. 39 & 40). It appears that one card may have been a replacement card. (Tr. at 96, ll. 2–4).

22. The Court notes that the involuntary petition against Smith has already been dismissed. Thus, whether Smith had seven, nine, or fifty (50) eligible creditors has no real import at this juncture. However, because SDC steadfastly maintains that Smith had less than twelve qualified petitioning creditors at

the time of filing, the Court will review each creditor's pre-petition eligibility status.

23. Smith had an Optima Card, The Executive Corporate Card, and a Platinum Card. (Smith Exs. 4, 5 & 6; SDC Exs. 34, 35 & 36).

24. Smith testified that he was under the impression that his American Express accounts were with three separate entities since monthly payments on the accounts were mailed to different locations. (Tr. at 50, ll. 19–22; Tr. at 51, ll. 8–12).

25. Paragraph four of the note in question provides that it should be construed and interpreted pursuant to the laws of the State of Georgia. (Smith Ex. 13). Under Georgia law, "mutuality of a contract is measured as of the time for performance, not the date of

cordingly, the Court is of the view that Stonewood Investments did not have a pre-petition claim against Smith, *cf. In re Allegheny Int'l, Inc.*, 100 B.R. 247, 250 (Bankr.W.D.Pa.1989) ("a claim on a $1,000 note issued the day before bankruptcy would only be allowed to the extent of the cash actually advanced"), and thus could not have been a valid petitioning creditor in this case.

■ *Findley Chase, L.P.*—Findley Chase, L.P., is a limited partnership in which the sole general partner is a corporation wholly owned by Smith. (Tr. at 80, ll. 7–10). Findley Chase is an insider as that term is defined in § 101(31), and insiders do not qualify as petitioning creditors under the statute.[26] *See* 11 U.S.C. § 303(b)(2); *see also Matter of Int'l Teldata Corp.*, 12 B.R. 879, 882 (Bankr.Nev. 1981); 2 Collier on Bankruptcy ¶ 303.04[2], 303–31 (15th ed. rev.1998).

*Jackson Life Insurance Company*—Prepetition, Smith purchased a term life insurance policy from Jackson Life Insurance Company. (Tr. at 82, ll. 13–22). Smith admitted at trial that he was not indebted to Jackson Life on April 8, 1998. (Tr. at 82, l. 13—p. 84, l. 15). Thus, Jackson Life could not have been a valid petitioning creditor in this case.

■ *Security Connecticut Insurance Company*—The evidence reflects that Valerie M. Smith, Smith's current wife, owns a Security Connecticut term policy on Smith's life. (Tr. at 118, l. 18—p. 120, l. 1; SDC Ex. 33). Although Smith has made premium payments to Security Connecticut, there is no evidence that Smith was personally obligated to Security Connecticut as of the filing date.[27] (SDC Ex. 33). Such being the case, Security Connecticut was not eligible to serve as a petitioning creditor.

■ *Allmerica Life Insurance Company and Allstate Insurance Company*— Smith owns a whole life policy issued by Allmerica Life Insurance. (Smith Ex. 3). Smith borrowed against the policy's cash value, and the status of the loan as of March 3, 1998, was that Smith owed $612.69 in interest and $10,211.43 was the unpaid principal balance. (Id.). The cash value of the policy was $20,002.79. (Id.). SDC, describing the premiums as "concurrent purchases," argues that Allmerica was not a qualifying creditor because "[i]f you want to keep the insurance in place, you have to keep buying it on a monthly basis ...; on this type of insurance, they couldn't sue you for non-payment as you just cancel the insurance." (Tr. at 530, ll. 7–20).

The Court is generally familiar with whole life insurance policies and how they work. Usually, the consequence of a poli-

execution." *Rothberg v. Charles H. Hardin Constr. Co.*, 111 Ga.App. 41, 140 S.E.2d 520, 522 (1965); *see also Jones v. Quigley*, 169 Ga.App. 862, 315 S.E.2d 59, 60 (1984) (citations omitted), *aff'd after remand*, 174 Ga.App. 787, 332 S.E.2d 7 (1985), *aff'd*, 255 Ga. 33, 334 S.E.2d 664 (1985). In the case sub judice, the Court must look at the status of the contract as of April 8, 1998. "A contract is unilateral in the sense that renders it invalid when one party to it is bound and the other is not, or when one party gets something and the other nothing." *Tattersall Club Corp. v. White*, 232 Ga.App. 307, 501 S.E.2d 851, 854 (1998) (citation omitted). As of the filing date, Smith had received nothing from Stonewood Investments.

26. On February 1, 1998, Smith executed a $7,500 promissory note in favor of Findley Chase. (Smith Ex. 15). However, Smith testified that no money changed hands between he and Findley Chase and that the transaction was nothing more than a "journal entry." (Tr. at 81, l. 3—p. 82, l. 12; SDC Ex. 26). Consequently, to the extent Smith owes any money to Findley Chase, for all intents and purposes, he owes it to himself.

27. Smith testified that he must maintain the policy under a divorce decree. (Tr. at 119, l. 10—p. 120, l. 9). When asked why his current wife is the actual owner of the policy, Smith explained that she owns the policy for estate planning purposes. (Tr. at 119, ll. 19–23). Be that as it may, there does not appear to be privity of contract between Smith and Security Connecticut.

cy holder's failure to remit premium payments is cancellation of the policy with no recourse to the insurer. Further, insurers typically do not permit an insured to borrow more than the cash value of a whole life policy. However, neither party made the policy or the loan agreement part of the record in this case. Without the benefit of reviewing the policy and loan agreement, the Court can not determine if Allmerica had a "right to payment" on the petition date. It is conceivable that the policy or loan agreement contains some type of a payment option in favor of the insurer or a grace period in the event of a missed premium.

The Federal Rules of Evidence permit a court to take judicial notice of a fact "not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." FED. R.EVID. 201(b). According to the Eleventh Circuit "the taking of judicial notice of facts is, as a matter of evidence law, a highly limited process. The reason for this caution is that the taking of judicial notice bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in [bankruptcy] court." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir.1997) (court can take judicial notice of (i) scientific facts such as when the sun rises or sets; (ii) geographical facts like the boundaries of a state; or (iii) historical facts such as the name of the president in 1958), *cert. denied*, 522 U.S. 1049, 118 S.Ct. 693, 139 L.Ed.2d 638 (1998). That an insurance policy automati-

cally cancels upon nonpayment of premiums, the end result of which is that the insurer has no claim against the insured is not the kind of fact upon which this Court can take judicial notice. Thus, SDC has failed to prove that Allmerica Life Insurance should be excluded as a qualifying creditor.[28]

██ *Arrow Exterminators, MediaOne, Inc., and Bell South*—Smith testified that he pays Arrow Exterminators $35 per month for standard pest control services. (Tr. at 65, ll. 15–16). It appears that MediaOne provides cable television to Smith on a monthly basis. (Tr. at 62, ll. 6–17; Smith Ex. 16). As for Bell South, the evidence reflects that Smith pays Bell South relatively small amounts every month for telephone service. (Smith Ex. 19). Although Smith did not dispute that he was not indebted to either Arrow Exterminators or MediaOne on the petition date, (Tr. at 114, ll. 1–24), the law in this circuit is that small, recurring creditors which have claims for utilities, etc., are not eligible to initiate involuntary bankruptcy proceedings. *Denham v. Shellman Grain Elevator, Inc.*, 444 F.2d 1376, 1379 (5th Cir.1971);[29] *Sipple v. Atwood (In re Atwood)*, 124 B.R. 402, 406 (S.D.Ga.1991) (noting that "although *Denham* was decided prior to the adoption of the present Bankruptcy Code, nothing in the Code suggests a change in congressional intent on this issue"); *In re Smith*, 123 B.R. 423 (Bankr.M.D.Fla.1990), *aff'd*, 129 B.R. 262 (M.D.Fla.1991). To the extent that Arrow Exterminators, MediaOne, and Bell South held *de minimis*, recurring claims against Smith on the filing date, such creditors were not eligible for consideration in de-

---

**28.** Allstate provides Smith's automobile insurance coverage. Smith testified that he pays the premiums in installments. (Tr. at 62, l. 22—p. 63, l. 14). The Allstate policy was also not admitted into evidence. For the same reason discussed above, the Court can not assume that Allstate did not have a "right to payment" against Smith on the petition date. Accordingly, SDC failed to carry its burden of proof that Allstate was not qualified as a petitioning creditor.

**29.** This Court is bound by the decisions of the former Fifth Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir.1981) (decisions of the Fifth Circuit Court of Appeals handed down prior to September 30, 1981, are binding on bankruptcy courts in the Eleventh Circuit).

termining the number of creditors needed to join in an involuntary petition.

■ *Bronnie Smith*—On August 23, 1993, in the divorce case of Bronnie and David Smith, a document entitled "Memorandum of Understanding" was filed in the Superior Court of Fulton County. (SDC Ex. 54). Pursuant to that Memorandum of Understanding, Smith was obligated to pay monthly child support in the amount of $1,250 per child, tuition for each child to attend Woodward Academy, and tuition for each child to attend the college of his or her choice. (SDC Ex. 54, ¶ 2). Paragraph three of the Memorandum of Understanding provides that Smith must pay $3,500 in monthly alimony to Bronnie Smith until such time as she dies or remarries.[30] (SDC Ex. 54, ¶ 3).

■ With respect to Bronnie Smith's status as a pre-petition creditor, SDC's position is that her claim is excluded under § 303(b) since it is contingent upon her being alive and being single.[31] (Tr. at 25, ll. 8–18; Tr. at 533, ll. 2–14). The Court disagrees. Section 303(b)(1) provides that a creditor whose claim is "contingent as to liability" lacks standing to file an involuntary petition. In this case, a "contingent claim" and a "claim contingent as to liability" are entirely different. For example, Smith's payment of child support and alimony is no doubt contingent on the lives of his children and former spouse, respectively. However, that payment of Smith's divorce related obligations is contingent upon the lives of the obligees does not mean that the obligations are "contingent as to liability." "[I]f a legal obligation to pay arose at the time of the original relationship, but that obligation is subject to

being avoided by some future event or occurrence, the claim is not contingent as to liability . . . ." *In re All Media Properties, Inc.,* 5 B.R. 126, 131 (Bankr.S.D.Tex. 1980), *aff'd* 646 F.2d 193 (5th Cir.1981); *see also Chicago Title Ins. Co. v. Seko Inv., Inc. (In re Seko Inv., Inc.),* 156 F.3d 1005, 1008 (9th Cir.1998) (claim is contingent as to liability when debtor's duty to pay arises only upon occurrence of future event that was contemplated by parties at time of contract execution). Smith's liability to pay alimony, child support, and education expenses was established by the execution of the Memorandum of Understanding. Although a future event such as a death might affect payment, no future event short of a modification of the Memorandum of Understanding or a court order can alter Smith's liability. Inasmuch as Bronnie Smith's claim was not contingent as to liability, she had standing on April 8, 1998, to file an involuntary petition against Smith.

*Canterbury Square, L.L.C.*—Canterbury Square, L.L.C., was involved in pre-petition litigation with Smith. (Tr. at 68, ll. 14–17). Unfortunately, few details were provided to the Court regarding the litigation and Canterbury Square's claim. It does appear that Smith filed a counterclaim against Canterbury Square, and that Canterbury Square made an offer to settle the lawsuit by paying Smith money. (Tr. at 69, ll. 9–16). Smith refused to settle, referring to Canterbury Square's lawsuit as "totally ridiculous." (Id.).

Ellenberg testified on several occasions that Canterbury Square's claim, as of the petition date, was subject to a bona fide dispute.[32] (Tr. at 501, ll. 17–25; Tr. at 507,

---

**30.** The Memorandum of Understanding was amended by consent on July 26, 1995. (SDC Ex. 55). The amendment did not alter Smith's monthly alimony and child support payments.

**31.** To the extent that Bronnie Smith has custody of the children, she is a "child support obligee" and is specifically recognized as a creditor of Smith (the "child support obli-

gor") under Georgia law. *See* GA. CODE ANN. § 19–6–35(a & b).

**32.** Notwithstanding its confidence that Canterbury Square's claim was the subject of a bona fide dispute, SDC tried to get Canterbury Square to join in the filing of the involuntary petition. (Tr. at 276, ll. 11–17; Tr. at 369, ll. 14–17).

l. 24—p. 508, l. 10; Tr. at 532, l. 24—p. 533, l. 1). The Court notes that Smith did not dispute that Canterbury Square's claim against him is the subject of a bona fide dispute. Further, that Canterbury Square, as plaintiff, attempted to settle with Smith lends some credence to the notion that perhaps its claim was weak, or that Smith's defenses and counterclaim had merit. Nevertheless, it appears that the parties agree that Canterbury Square did not have standing to file an involuntary petition.

In summary, SDC had the burden at trial to prove that Smith had less than twelve qualifying creditors. *Atlas Machine & Iron Works*, 986 F.2d at 715–16. The Court finds that as of April 8, 1998, the following creditors had standing as involuntary petitioners: Fidelity National Bank, NationsBank Credit Line, American Express, First Union Master Card, First Bankcard MasterCard, Wachovia Visa, Tom Turrentine, Schreeder, Wheeler, and Flint, Bronnie Smith, and SDC. In contrast, the following entities were not eligible petitioners: Stonewood Investments, Findley Chase, L.P., Jackson Life Insurance, Security Connecticut Insurance, Arrow Exterminators, Bell South, MediaOne, Inc., and Canterbury Square, L.L.C. If Allmerica Life Insurance and Allstate Insurance are added to the list of creditors which did have standing to file an involuntary petition, the number of eligible creditors totals twelve. Accordingly, the Court concludes that SDC failed to satisfy its burden of establishing that the number of eligible petitioning creditors in this case was less than twelve.

*V. As of the Filing Date, was Smith Generally Not Paying His Debts as They Became Due?*

■ Section 303(h)(1) provides that "the court shall order relief against the debtor in an involuntary case . . ., only if the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute." In the case sub judice, SDC bears the burden of demonstrating that Smith was generally not paying his debts as they became due. *In re The Food Gallery at Valleybrook*, 222 B.R. 480, 486 (Bankr.W.D.Pa.1998); *In re West Side Community Hospital, Inc.*, 112 B.R. 243, 253 (Bankr.N.D.Ill.1990); *In re CLE Corp.*, 59 B.R. 579, 585 (Bankr.N.D.Ga. 1986) (Cotton, J.). Courts have consistently held that whether an alleged debtor is generally not paying his or her debts should be determined as of the date of the involuntary filing. *Bartmann v. Maverick Tube Corp.*, 853 F.2d 1540, 1546 (10th Cir. 1988); *In re Knoth*, 168 B.R. 311, 317 (Bankr.D.S.C.1994); *In re Better Care, Ltd.*, 97 B.R. 405, 408 (Bankr.N.D.Ill.1989); *West Side Community Hospital*, 112 B.R. at 256 (citations omitted); *In re Caucus Distrib., Inc.*, 83 B.R. 921, 932 (Bankr. E.D.Va.1988).

*A. Applicable Legal Standard*

■ Because the term "generally not paying" is not defined in the Bankruptcy Code, application of the term has been the subject of much litigation and debate. Courts have struggled to reduce the term "generally not paying" to a workable judicial standard. *The Food Gallery at Valleybrook*, 222 B.R. at 486; *In re Dakota Lay'd Eggs*, 57 B.R. 648, 657 (Bankr. D.N.D.1986). The starting point for the "generally not paying" analysis is the *All Media Properties* case, wherein the court stated:

> The term "generally" was not defined in order to avoid the result suggested by the mechanical test put forth by the alleged debtors and to give the bankruptcy courts enough leeway to be able to deal with the variety of situations that will arise. Instead, the court believes that generally not paying debts includes regularly missing a significant number of payments to creditors or regularly missing payments which are significant in amount in relation to the size of the debtor's operation. Where the debtor has few creditors the number which will

be significant will be fewer than where the debtor has a large number of creditors. Also, the amount of the debts not being paid is important. If the amounts of missed payments are not substantial in comparison to the magnitude of the debtor's operation, involuntary relief would be improper.

5 B.R. at 143; *see also In re Tarletz,* 27 B.R. 787, 789 (Bankr.D.Colo.1983) (term "generally" not defined on purpose to avoid the imposition of a mechanical test and to give the court flexibility to deal with a variety of situations). While courts have utilized various factors for determining whether an alleged debtor is generally meeting his or her financial obligations, most courts do not favor application of a rigid mechanical test. Instead, as was suggested in *All Media Properties,* the majority of courts have adopted a flexible approach, the focus of which is the totality of the alleged debtor's financial circumstances. *See Concrete Pumping Serv., Inc. v. King Construction Co., Inc. (In re Concrete Pumping Serv., Inc.),* 943 F.2d 627, 630 (6th Cir.1991); *Bartmann v. Maverick Tube,* 853 F.2d at 1546 (courts should consider the totality of the circumstances, balancing the alleged debtor's and creditors' interests); *The Food Gallery at Valleybrook,* 222 B.R. at 486–87; *H.I.J.R. Properties Denver v. Shideler (In re H.I.J.R. Properties Denver),* 115 B.R. 275, 277 (D.Colo.1990) (considered factors such as the number of debts, the amount of delinquencies, the materiality of nonpayment, and the nature of the debtor's conduct with respect to his financial affairs); *West Side Community Hospital,* 112 B.R. at 256; *In re Better Care, Ltd.,* 97 B.R. 405, 407–08 (Bankr.N.D.Ill.1989) ("Congress intended the test to be applied with flexibility so as not to limit or restrict the involuntary process"); *CLE Corp.,* 59 B.R. at 586 (court examined the number and amount of debts, the amount of delinquen-

cy, the alleged debtor's liquidity, and nature and conduct of the alleged debtor's financial affairs; however, examination of alleged debtor's entire financial situation and debt structure may be necessary); *Dakota Lay'd Eggs,* 57 B.R. at 657 ("although offering guidance, the mechanical test must be employed with regard to any unique circumstances attendant to a particular proceeding"); *Matter of B.D. Int'l Discount Corp.,* 15 B.R. 755, 762 (Bankr. S.D.N.Y.1981) (courts need "enough leeway to be able to deal with the variety of situations that will arise"), *aff'd,* 24 B.R. 876 (S.D.N.Y.1982), *aff'd,* 701 F.2d 1071 (2nd Cir.1983), *cert. denied,* 464 U.S. 830, 104 S.Ct. 108, 78 L.Ed.2d 110 (1983); *Matter of Gill Enter., Inc.,* 15 B.R. 328, 331 (Bankr.D.N.J.1981); 2 COLLIER ON BANKRUPTCY ¶ 303.14[1][b], 303–80 (15th ed. rev. 1998) (listing seventeen (17) factors used by various courts to determine whether debtor generally paying debts).[33] In determining whether Smith was "generally not paying" his debts as said debts became due, the Court will apply the "totality of the circumstances" or "flexible" test. Having settled on a standard which gives the Court considerable discretion and leeway, the Court will focus its inquiry on the nature and amount of Smith's debts, and the circumstances surrounding his payment or nonpayment of said debts.

## B. Routine Monthly Bills

As of the petition date, Smith had two automobile loans from Fidelity National Bank, and his monthly payment was $1,580.49. (Tr. at 80, ll. 1–6; SDC Ex. 25). There is no evidence before the Court that Smith was in arrears to Fidelity National as of the filing date. Similarly, there is nothing in the record that suggests that Smith was falling behind on his monthly insurance premiums, utility bills, alimony,

---

33. It is clear from the case law that courts do not approach the "generally not paying" analysis strictly from a mathematical standpoint. If the task was intended to be a simple arithmetical exercise, Congress would have reflected that intent in the wording of the statute.

child support, and education expenses.[34]

### C. Credit Card Debts

 Smith frequently charged purchases on as many as eight credit cards. The majority of purchases were for gasoline, food, and entertainment. Numerous credit card account statements were admitted into evidence. A summary of Smith's pre-petition payment history with respect to each card is as follows: [35]

*American Express Optima* Smith paid $358 on February 6, and $370 on March 7. Both payments were made several days late. (Tr. at 86, l. 14—p. 87, l. 11; Smith Ex. 4; SDC Ex. 34).

*American Express, The Executive Corporate Card* The statements reflect three payments by Smith, $5,694.67 on February 6, $1,168.97 on March 7, and $342.35 on April 5. (Smith Ex. 5; SDC Ex. 35). It does not appear that any of the payments were untimely.

*American Express Platinum* The statements indicate payments of $1,925.28, $3,230.63, and $1,264.17 on February 6, March 7, and April 6, respectively. During the billing periods in question, the account was always thirty (30) days past due. It appears that Smith tendered the aforementioned payments in time to avoid delinquency fees. (Tr. at 88, l. 7—p. 89, l. 23; Smith Ex. 6; SDC Ex. 36).

*Wachovia (account one)* Smith paid $270 on February 8, $277 on March 9, and $278 on April 5. Smith apparently made timely payments as no late fees were assessed. (Smith Ex. 7; SDC Ex. 39).

*Wachovia (account two)* Smith paid $638 on February 2, and $293 on February 6. Smith was charged a late fee on March 17. (Tr. at 96, l. 14—p. 97, l. 14; SDC Ex. 40).

*First Union (account one)* Smith made a timely payment of $217 on April 6. (Smith Ex. 8; SDC Ex. 37).

*First Union (account two)* The evidence reveals that a payment of $135 was due on March 30, but was not made until April 7. Further, it appears that Smith paid an additional $500 on this account on April 7, the day before the petition was filed. (Smith Ex. 9; SDC Ex. 37).

*First Bankcard* The statements reflect payments of $266, $278, $360.04, and $385.71 on December 23, 1997, February 11, February 27, and April 7, respectively. First Bankcard did impose a late fee on Smith on April 2. (Smith Ex. 10; SDC Ex. 38).

From a review of the account statements, the Court has determined that Smith's total credit card indebtedness as of April 8, 1998, was approximately $54,000.[36] (Smith Exs. 4–10; SDC Exs. 34–40). As for the cards with credit limits, the Court notes that Smith was either over or just under those limits. In virtually every instance, Smith made the required or minimum monthly payment on the credit card debt. While it is clear that Smith was not making any headway toward reducing the credit card debt, Smith, for the most part, was making the minimum payments in a timely fashion.[37] Thus, as for Smith's credit card obligations, the Court is unable to conclude that Smith was generally not paying said debts as they became due.

**34.** That Smith was apparently current with alimony and child support is not surprising. Those who fail to make such payments face contempt citations and possible incarceration. *See* GA. CODE ANN. § 19-6-28.

**35.** All of the payments were made in 1998, unless otherwise noted.

**36.** In addition to the traditional credit card debt, NationsBank extended Smith a $5,000 line of credit. (Smith Ex. 2). There is no evidence that NationsBank had a past due claim against Smith at any time prior to the filing. However, as of the petition date, Smith had exhausted the line of credit. (Tr. at 84, l. 19—p. 86, l. 5; SDC Ex. 31).

**37.** As for the credit card debt, Ellenberg admitted that Smith's December, 1997, and February, 1998, credit reports reflect positive credit. (Tr. at 476, ll. 15–21).

### D. Claim of Schreeder, Wheeler & Flint

 Schreeder, Wheeler & Flint represented Smith in the Jefferson Creek litigation. (Tr. at 104, ll. 5–14). For the period August 1995, through July, 1997, the firm submitted twenty-four (24) monthly billing statements to Smith. (SDC Ex. 43). Smith responded to the billing statements by remitting only six payments. (Id.). Specifically, Smith paid the firm $57.95 in November, 1995, $20,000 in September, 1996, $30,000 in November, 1996, $25,791.18 in January, 1997, $572.19 in March, 1997, and $10,000 in July, 1997. (Id.). As of July 31, 1997, Smith owed the firm $41,864.83 for legal fees in connection with the Jefferson Creek case. (Id.).

Schreeder, Wheeler & Flint likewise represents Smith in the SDC lawsuit pending in the State Court of Fulton County. (Tr. at 108, l. 24—p. 109, l. 3). The record reflects that from August, 1996, through March, 1998, the firm submitted eighteen (18) billing statements to Smith regarding the SDC dispute.[38] (SDC Ex. 44). Smith made four payments during the period in question, resulting in an ending balance due of $11,909.83. (Id.).

Because Smith was behind in his payments to Schreeder, Wheeler & Flint, he gave the firm a note on February 1, 1998, in the amount of $53,248.91. (Tr. at 544, ll. 2–10; SDC Ex. 45). The note is payable on demand. (Id.). The face amount of the note includes an interest charge on the unpaid invoices, and interest on the note accrues at eight percent (8%) per annum. (Tr. at 557, l. 20—p. 558, l. 7; SDC Ex. 45). David Flint of Schreeder, Wheeler & Flint testified that Smith has not defaulted under the note because the firm has made no demand for payment. (Tr. at 544, ll. 11–21).

To summarize the evidence with respect to the debtor-creditor relationship between Smith and Schreeder, Wheeler & Flint, the firm submitted over forty (40) invoices to Smith during the period August, 1995, through March, 1998. Smith made ten payments. As of February 1, 1998, the firm determined that Smith owed it $53,-248.91, a figure which includes interest on the unpaid invoices. While it is true that the firm holds a demand note and that no demand for payment has been made, the Court is of the view that the note represents a forbearance agreement between Schreeder, Wheeler & Flint and Smith.

 The term "forbearance" is defined as the "[g]iving of further time for repayment of obligation or agreement not to enforce claim at its due date." BLACK'S LAW DICTIONARY 644 (6th ed.1990). The issue is whether the Court should exclude the Schreeder, Wheeler & Flint note from its "generally not paying debts" analysis since the note was technically not due on the filing date. The Court must decide this issue in the negative as "making arrangements to extend payment is evidence of failure to pay debts as they become due." *All Media Properties*, 5 B.R. at 145. *See also Knoth* 168 B.R. at 318 (citing *All Media Properties*); *Matter of Int'l Teldata Corp.*, 12 B.R. 879, 882 (Bankr.D.Nev. 1981) (deferral of payments to insiders relevant to court's determination of whether debtor generally paying its debts as they were due) (citing *All Media Properties*). As for his firm's claim, Flint made it abundantly clear that he expects Smith to honor the note as soon as funds become available. (Tr. at 558, l. 13—559, l. 21). Put another way, Schreeder, Wheeler & Flint was forced to wait for payment out of necessity. It is clear to the Court that as of the filing date, Smith had not paid the firm because Smith was without the means to pay the firm.

### E. Claim of Tom Turrentine

Turrentine's claim arose by virtue of his involvement with Smith in a partnership

---

**38.** Billing statements for January and July, 1997, were omitted from SDC Ex. 44. However, a review of the previous months' ending balances and the next months' beginning balances indicates that Smith paid approximately $5,000 in January and nothing in July.

bankruptcy case that was pending in the Middle District of Georgia as late as 1997. (Tr. at 97, l. 18—p. 101, l. 20). At his deposition, Turrentine testified that what Smith owed him actually came due in January, 1998.[39] (Turrentine Deposition at 17, ll. 2–5). The Court notes with interest that Smith testified that Turrentine owed him money in January, 1998. (Tr. at 101, ll. 12–15). For reasons and under circumstances not entirely clear to the Court, Smith executed a $46,648.62 promissory note in favor of Turrentine on February 15, 1998. (Smith Ex. 1). By its terms, payment on the note was not due until August 15, 1998. If Smith, however, owed Turrentine the money as early as January, 1998, Smith's note to Turrentine could be considered a forbearance. Unfortunately, the Court is unable to determine from the conflicting record before it if the note represented a forbearance. Thus, the Court must rely on the note itself, and as of the filing date, payment thereon was not due.

## F. Claim of SDC

The Court ruled earlier that SDC has at least a $100,000 claim against Smith that is not contingent as to liability or the subject of a bona fide dispute. From August 31, 1995, through April 3, 1996, SDC made numerous oral and written requests of Smith that he honor his indemnity obligations by paying SDC's legal fees and expenses in the Jefferson Creek lawsuit. (SDC Exs. 7, 8, 11, 12, 13, 14, 15, 16, 19). As of the petition date, Smith had not paid SDC any money pursuant to the indemnity. (Tr. at 209, ll. 13–20). Smith contends that his failure to pay is the result of a legitimate, well-grounded dispute over the amount of SDC's claim. Smith's contentions in this regard are without foundation. The Court is of the opinion that SDC has a valid six figure claim against Smith that has gone unpaid since the Fall of 1995.

## G. Summation

It appears to the Court that Smith was regularly paying his monthly household expenses. There is no evidence that Smith was in arrears on his monthly alimony and child support payments. Smith, with a few exceptions, was making the minimum monthly payments on his credit cards. The evidence reflects that as of April 8, 1998, Smith was generally paying his every day living expenses.

When the Court examines the payment history of Smith, the businessman, the facts are quite different. Smith has made only sporadic payments to his lawyers since August of 1995. Smith has made no payment to SDC on his indemnity since the Fall of 1995. These debts, unlike household obligations which call for periodic payments, are extraordinary in nature and constitute a substantial portion of Smith's total indebtedness.[40] *See The Food Gallery at Valleybrook*, 222 B.R. at 487–88 (scenario in which debtor makes smaller periodic payments but fails to pay one or two large creditors can support a finding that debtor is failing to pay debts as such become due); *Int'l Teldata Corp.*, 12 B.R. at 883 (despite its payment of small periodic obligation, debtor was not paying three large debts; thus, debtor was not generally paying its debts); *Matter of Hill*, 5 B.R. 79, 83 (Bankr.D.Minn.1980) (same); *see also Concrete Pumping Service*, 943 F.2d at 630 (debtor generally not paying its debts inasmuch as debtor was in default on 100% of its outstanding debt to its only creditor); *Crown Heights Jewish Community Council, Inc. v. Fischer (In re Fischer)*, 202 B.R. 341, 350–51 (E.D.N.Y. 1996) ("even though an alleged debtor may owe only one debt, or very few debts, an order for relief may be granted where such debt or debts are sufficiently substantial to establish the generality of the alleged debtor's default"). As of the filing

---

**39.** Turrentine's deposition transcript was admitted into evidence.

**40.** Turrentine's note had not matured as of the filing date. Thus, Smith had neither satisfied nor defaulted on the obligation.

date, Smith had been in arrears to SDC and Schreeder, Wheeler & Flint for more than two years. The length of time during which Smith has failed to pay these two creditors is crucial to this inquiry. *In re Everett*, 178 B.R. 132, 139 (Bankr. N.D.Ohio 1994); *Knoth*, 168 B.R. at 317 (one of the factors utilized by court was the length of time debtor was unable to pay large debts). After considering the totality of the circumstances, the Court finds that Smith has generally failed to pay his extraordinary debts over a period that exceeds two years and that such failure supports the conclusion that Smith, as of the petition date, had generally failed to pay his debts as such became due.

## VI. Did SDC File the Involuntary Petition in Bad Faith?

 Smith contends that SDC filed the involuntary petition in bad faith.[41] Section 303(i)(2) specifically provides that a bankruptcy court can award damages in the event an involuntary is filed in bad faith. There is, however, a presumption that petitioning creditors act in good faith. *CLE Corp.*, 59 B.R. at 583 (citations omitted); *see also In re Crown Sportswear, Inc.*, 575 F.2d 991, 993 (1st Cir.1978); *West Side Community Hospital*, 112 B.R. at 259. To overcome that presumption, Smith must prove by a preponderance of the evidence that SDC filed this case in bad faith. *CLE Corp.*, 59 B.R. at 583 (citation omitted). Furthermore, "[t]he presence or absence of bad faith is a question of fact." *In re K.P. Enterprise*, 135 B.R. 174, 179 n. 13 (Bankr.D.Me.1992) (citations omitted); *In re Fox Island Square Partnership*, 106 B.R. 962, 967 (Bankr. N.D.Ill.1989).

### A. Applicable Legal Standards

Courts have articulated a variety of standards or tests for determining bad faith. *General Trading Inc. v. Yale Materials Handling Corp.*, 119 F.3d 1485, 1501

(11th Cir.1997), *cert. denied*, *Gonzalez Trading, Inc. v. Yale Materials Handling Corp.*, 523 U.S. 1055, 118 S.Ct. 1380, 140 L.Ed.2d 526 (1998). For example, some courts have found bad faith to exist where the filing was motivated by an improper purpose, such as ill will, malice, embarrassment, or harassment. *See In re Camelot, Inc.*, 25 B.R. 861, 864 (Bankr. E.D.Tenn.1982) (motivation for filing was "to spitefully forestall the dissolution of the debtor" and to frustrate the results of a state court action); *Sjostedt v. Salmon (Matter of Salmon)*, 128 B.R. 313, 315 (Bankr.M.D.Fla.1991) (filing motivated by desire "to ruin and destroy and put in jail and put out of business" the alleged debtor); *In re Better Care, Ltd.*, 97 B.R. 405, 412, 412 (Bankr.N.D.Ill.1989) ("petitioners maliciously intended to shut down [alleged debtor's] business because of personal antipathy" for one of its founders); *In re F.R.P. Indus., Inc.*, 73 B.R. 309, 313 (Bankr.N.D.Fla.1987) (bad faith found where creditor's motive was to use involuntary bankruptcy as a means of effectuating a takeover of a profitable business).

Other courts have found bad faith to exist "when a creditor's actions amount to an improper use of the Bankruptcy Code as a substitute for customary collection procedures." *General Trading Inc.*, 119 F.3d at 1501 (quoting *Better Care, Ltd.*, 97 B.R. at 410). "The 'improper use' test finds bad faith when a petitioning creditor uses involuntary bankruptcy procedures in an attempt to obtain a 'disproportionate advantage' for itself, rather than to protect against other creditors obtaining disproportionate advantages, particularly when the petitioner could have advanced its own interests in a different forum." *K.P. Enterprise*, 135 B.R. at 179 n. 14; *Better Care, Ltd.*, 97 B.R. at 411. *See, e.g., Basin Electric Power Cooperative v. Midwest Processing Co.*, 769 F.2d 483, 487 (8th Cir.1985) (use of an involuntary for non-

---

**41.** The concept of good faith, or the lack of bad faith, permeates the Bankruptcy Code. According to the Court's calculations, the term "good faith" appears in the Code nineteen (19) times.

bankruptcy purpose such as obtaining an advantageous position with regard to a letter of credit is evidence of bad faith), *cert. denied,* 474 U.S. 1083, 106 S.Ct. 854, 88 L.Ed.2d 894 (1986); *In re SBA Factors of Miami, Inc.,* 13 B.R. 99, 100–01 (Bankr. S.D.Fla.1981) (bad faith found where involuntary used as a substitute for customary collection procedures); *In re F.R.P. Indus., Inc.,* 73 B.R. 309, 313 (Bankr. N.D.Fla.1987) (bad faith found in part because petitioner made no effort to avail himself of state law collection remedies).

The Eleventh Circuit has recognized a third line of cases which view bad faith in the context of Rule 9011 of the Federal Rules of Bankruptcy Procedure. *See General Trading Inc.,* 119 F.3d at 1501–02. Rule 9011(b) provides:

By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances,—

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;

(2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;

(3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

FED.R.BANK.PROC. 9011. The Rule 9011 test focuses on both objective and subjective standards. "An analysis under Rule 9011 inquires into 'a significant objective requirement bearing on the legal justification of a claim or defense: a reasonable inquiry into the facts and the law.' In addition to requiring an objective inquiry, Rule 9011 requires a subjective inquiry as well: the bankruptcy proceeding cannot have been interposed for an improper purpose, 'such as to harass, to cause delay, or to increase the cost of litigation.'" *General Trading Inc.,* 119 F.3d at 1502 (quoting *In re Turner,* 80 B.R. 618, 623 (Bankr. D.Mass.1987)). Several courts have affirmatively adopted a combination objective/subjective test. *See Atlas Machine & Iron Works, Inc. v. Bethlehem Steel Corp.,* 986 F.2d 709, 716 (4th Cir.1993) (court should examine "whether a reasonable person would have filed the petition as well as the motivations of the petitioner"); *In re Dino's, Inc.,* 183 B.R. 779, 783–84 (S.D.Ohio 1995); *K.P. Enterprise,* 135 B.R. at 179–80 (Rule 9011 test is preferred because it explores both objective and subjective indicia of bad faith); *Fox Island Square Partnership,* 106 B.R. at 968 (Bankr.N.D.Ill.1989)(same); *cf. Jaffe v. Wavelength, Inc. (In re Wavelength, Inc.),* 61 B.R. 614, 620 (9th Cir. BAP 1986) (bad faith measured by the objective reasonable person standard).

▮ The Court observes that distinctions between the improper purpose test, the improper use test, and the Rule 9011 test are not readily apparent, as the three tests have overlapping features and considerations. Although the Eleventh Circuit stopped short of formally adopting a particular bad faith standard in *General Trading Inc.,* its conclusion in the case is instructive. In *General Trading Inc.,* the Eleventh Circuit found that the involuntary petition was appropriate from both an objective and a subjective point of view. 119 F.3d at 1502. Thus, it is appropriate for this Court to apply the broader Rule 9011 test, which utilizes both objective and subjective bad faith criteria. Bearing this

test in mind, the Court will examine five troubling aspects of this case.

*B. SDC's Inability to Identify Fraudulent Transfers*

 Throughout the trial, SDC's witnesses complained of Smith's transfer, concealment, and/or dissipation of his assets. When asked why SDC filed the involuntary petition, Steinemann responded that their theory was that Smith was illegally transferring assets. (Tr. at 197, ll. 1–12).[42] Steinemann testified further that during the period February 27, 1998, through April 8, 1998, SDC performed "considerable due diligence to determine the feasibility" of filing the petition and tried to determine "where [Smith] was transferring assets." (Tr. at 200, l. 25—p. 201, l. 10). When asked if he knew of specific transfers which were improper, illegal, or fraudulent, Steinemann basically answered that the accusations were based on suspicion, (Tr. at 216, l. 15—p. 217, l. 4), and comments from other people. (Tr. at 210, ll. 5–25). Steinemann admitted that

SDC had no documentary evidence to support its many accusations. (Tr. at 213, l. 4—p. 214, l. 4).

In addition to Steinemann's testimony, Levenson testified that Smith had engaged in "monkey business" and that he felt like a bankruptcy court could deal effectively with Smith's "unlawful transfers." (Tr. at 282, l. 7—p. 283, l. 17). At trial, Levenson was also unable to pinpoint any such "unlawful transfers." (Tr. at 285, ll. 8–15). Likewise, Day could not identify a single improper or fraudulent transaction involving Smith's assets. (Tr. at 420, l. 23—p. 421, l. 1). While Ellenberg was unable to point to any specific transfer or asset disposition that might be illegal or improper, he did allude to the possibility of Smith's assets having been transferred to Texas. (Tr. at 485, l. 25—486, l. 4; Tr. at 516, ll. 5–9; Tr. at 536, ll. 8–9).[43]

That Smith has nefariously transferred his assets is the unmistakable theme of SDC's argument and its justification for filing the petition.[44] Of concern to the

---

**42.** When asked a second time why the involuntary petition was filed, Steinemann responded: "I was advised by Mr. Ellenberg that this would be a way to stop any asset transfers or whatever that may be going on. And, that was, I think, the primary reason that we elected to go forward, but I did this on the advice of Mr. Ellenberg, who is a bankruptcy lawyer." (Tr. at 215, ll. 13–21).

**43.** In a letter to Ron Day dated March 5, 1998, Ellenberg referred to Smith's secretion of assets. (Smith Ex. 30). In that same letter Ellenberg informed Day that "The Bankruptcy Code and the authority granted a Trustee are of great assistance in marshaling and discovering assets and is superior to a state court judgment." (Id.). In an affidavit filed with the Court, Ellenberg again averred that Smith appeared to be secreting assets. (Ellenberg Affidavit, ¶¶ 8 & 19, July 13, 1998).

**44.** In a personal financial statement dated May 31, 1995, Smith represented his net worth to be in excess of $7.4 million. (SDC Ex. 2, § 3). In interrogatories signed by Smith on August 26, 1997, he reported a $20,000 net worth. (SDC Ex. 69, Interrogatories 9 & 10). In Ellenberg's mind, Smith's explanation for the drastic reduction in net worth—poor investments—"was most incred-

ible." (Tr. at 516, l. 12—p. 517, l. 23). If SDC's theory of fraudulent transfers is based in part on the reduction in Smith's net worth from May, 1995 to August, 1997, such theory might be misplaced.

SDC's trial counsel exposed Smith's personal financial statement as being inaccurate to the extreme. For example, Smith represented ownership of a personal bank account at Fidelity National Bank worth $843,000. (SDC Ex. 2, Schedule A). The funds were actually in the debtor-in-possession account of American Investment Medlock I, LP, a bankrupt company in the Middle District of Georgia. (Tr. at 159, l. 1—p. 161, l. 13). Smith represented that he owned $650,000 worth of Restore, Inc., stock. (SDC Ex. 2, Schedule B). The stock was not in Smith's name, and it appears that neither he nor one of his companies ever received it. (Tr. at 162, l. 11—p. 163, l. 2). Contrary to what he represented in his financial statement, Smith did not own certain unencumbered real property located at 6225 Amherst Drive worth $960,000. (Tr. at 168, ll. 23–25; SDC Ex. 2, Schedule G).

In the state court litigation, SDC has questioned the veracity of Smith's financial statement. Based on the evidence in this case, it

Court is that SDC's actions were based entirely on conjecture and supposition. In a sense, SDC based the filing on the adage "shoot first, ask questions later," or more appropriately, "file an involuntary bankruptcy petition, expect a trustee to ask questions later." SDC failed to demonstrate that Smith has transferred, concealed, or otherwise disposed of his assets. It necessarily follows that SDC failed to demonstrate that Smith has engaged in such activity with an intent to defraud his creditors. The Court is of the view that unsubstantiated allegations of fraudulent transfers constitute an insufficient reason to establish the propriety of an involuntary petition.

SDC's good faith is called into serious question upon examination of the primary reason for commencing the involuntary case and the timing of the filing. To reiterate, Steinemann testified that Smith's fraudulent conduct with respect to asset transfers provoked the filing. (Tr. at 197, ll. 1–12; Tr. at 215, ll. 13–21). Levenson testified that he first thought about filing an involuntary petition against Smith sometime in late February, 1998. (Tr. at 259, l. 8—p. 261, l. 2). Smith's financial statement upon which SDC relied in order to close the Northridge Property transaction was executed on May 31, 1995. (SDC Ex. 2). On that date, Smith represented his net worth to be in excess of $7.4 million. (Id. at § 3). Less than three months later, on August 14, 1995, Smith was unable to live up to his end of the bargain, which was to pay SDC $175,000. That SDC's concern over Smith's fraudulent transfers arose for the first time in

February, 1998, is simply not believable, especially since the parties have been litigating the indemnification and fraudulent financial statement issues for two years in Fulton County State Court. If asset transfers were of so much concern, the Court is at a loss to explain why SDC did not file an involuntary petition months, if not years, before it did. Moreover, if transfers were really the issue, it seems that SDC would not have delayed the filing from late February to April 8, 1998.[45]

The decision of the Court of Appeals of Georgia reversing the trial court as to SDC's damages was rendered on February 5, 1998 (SDC Ex. 6). In the Court's view, it is not a coincidence that the idea of an involuntary bankruptcy was deemed appropriate just a few weeks after what SDC had to consider a disappointing decision from the appeals court. On February 5, 1998, SDC's representatives knew that their only avenue of collection was to return to the trial court and prove its damages to a jury. (Tr. 192, ll. 16–21; Tr. at 257, ll. 7–18; Smith Ex. 24).

*C. SDC's Failure to Exhaust its State Court Remedies and Its Use of the Involuntary Filing as an Improper Debt Collection Device*

Despite the Court's finding that Smith was generally not paying his debts as said debts became due, the Court notes that SDC is the only creditor complaining about Smith's financial woes. Ellenberg admitted at trial that this matter boils down to a two-party dispute. (Tr. at 518, ll. 15–25). Although § 303 specifically authorizes a one creditor filing, courts have been reluctant to entertain a one creditor case

has occurred to the Court that Smith may have never owned some of the assets listed in the financial statement. SDC is confident that Smith has transferred the bulk of his assets, yet it knows that the document upon which part of that confidence is founded is probably false. Accordingly, there must be some doubt in the minds of SDC's representatives as to whether Smith has ever had much in the way of assets to transfer.

**45.** It appears that the lion's share of SDC's pre-filing investigation took place from Febru-

ary 23 to February 27, 1998. (Tr. at 272, l. 20—p. 273, l. 16; Tr. at 488, ll. 12–25). Indeed, drafts of the petition and Supplemental Allegations were prepared as early as February 27, 1998. (Smith Ex. 29). The reach back period for avoidance of fraudulent transfers under § 548 is only one year. A month and a half delay could be significant when the goal is to avoid or recover time-sensitive transfers.

absent a showing that bankruptcy can do something for the creditor that state law can not. Numerous involuntary cases have been dismissed on the basis that a single creditor filed the petition prior to exhausting its state law remedies. *See Bankers Trust Co. BT Serv. Co. v. Nordbrock (In re Nordbrock)*, 772 F.2d 397, 400 (8th Cir.1985) ("a creditor does not have a special need for bankruptcy relief if it can go to state court to collect a debt"); *Remex Electronics, Ltd. v. Axl Indus., Inc., (In re Axl Indus., Inc.)*, 127 B.R. 482, 484–86 (S.D.Fla.1991), *aff'd in part, appeal dismissed in part*, 977 F.2d 598 (11th Cir. 1992); (adequate state law remedies were available to resolve two-party dispute); *Central Hobron Assoc.*, 41 B.R. at 452 ("Bankruptcy courts exist for the purpose of giving extraordinary relief when the rules and courts that ordinarily take care of the day-to-day disputes that occur in business are no longer adequate"); *In re Arlumsa Dev. Corp.*, 33 B.R. 981, 983 (Bankr.S.D.N.Y.1983); *Matter of LeSher Int'l, Ltd.*, 32 B.R. 1, 2 (Bankr.S.D.N.Y. 1982); *In re Dwoskin*, 24 B.R. 41, 42 (Bankr.S.D.Fla.1982) (petition should be denied unless creditor would otherwise be without adequate remedy under non-bankruptcy law); *In re R.V. Seating, Inc.*, 8 B.R. 663, 665 (Bankr.S.D.Fla.1981) (creditor failed to demonstrate that it would not be able to obtain as much relief by proceeding in state court); *Matter of 7H Land & Cattle Co.*, 6 B.R. 29, 34 (Bankr. D.Nev.1980).

To the extent that Smith fraudulently transferred his property, such transfers can be set aside under Georgia law. *See* GA. CODE ANN. §§ 18–2–1, 18–2–2 & 18–2–22. Yet, there is no evidence that SDC has ever tried to recover the transfers under Georgia law. In addition, whether

Smith knowingly, and with fraudulent intent, executed a false financial statement is the gravamen of SDC's state court complaint. In the case sub judice, SDC has not shown its state court remedies to be inadequate.[46] To the contrary, Day confidently testified that SDC would ultimately prevail against Smith in the State Court of Fulton County. (Tr. at 361, ll. 17–24; Tr. at 422, ll. 5–8).

Rather than taking advantage of the finding of liability by proving its damages and then seeking to execute on a state court judgment, SDC effectively yanked the case right out from under the state court system. The only rational explanation for SDC's actions is that it was frustrated by and unhappy with the appeals court's decision. This Court can not ignore the fact that the petition was filed shortly after the Court of Appeals of Georgia reversed the trial court's damages award. "The bankruptcy court was never meant to serve as an insurance policy for creditors who fear that the state courts will not give them what they want." *Central Hobron Assoc.*, 41 B.R. at 451 (citing *In re R.N. Salem Corp.*, 29 B.R. 424, 429 (S.D.Ohio 1983)); *see also In re Nar-Jor Enter. Corp.*, 6 B.R. 584, 586 (Bankr. S.D.Fla.1980) (Bankruptcy Court not intended to be the forum for trying isolated disputed claims; there are courts of general jurisdiction for litigation of those issues).

SDC made no effort to exhaust its state court collection remedies. There is ample evidence to support the conclusion that SDC filed the petition as a means to avoid collecting its debt under Georgia law. *See SBA Factors of Miami*, 13 B.R. at 100 (bad faith found as petitioners used involuntary proceeding as a substitute for customary collection procedures); *F.R.P. Indus., Inc.*, 73 B.R. at 313 (bad faith found

---

**46.** The Court agrees with the proposition that involuntary petitions can be used by creditors to recover transfers that are unavoidable under state law. *H.I.J.R. Properties Denver*, 115 B.R. at 278–79 (involuntary petition proper as preference action can only be brought in bankruptcy court); *In re B.D. Int'l Discount Corp.*, 13 B.R. 635, 638–39 (Bankr.S.D.N.Y. 1981) (transfer of substantial assets to insiders and third parties created special circumstances). However, SDC failed to explain how and why it could not avoid Smith's alleged transfers under Georgia law.

in part because petitioner made no effort to avail himself of state law collection remedies); *cf. Dino's,* 183 B.R. at 783–84 (stating that the "use of the bankruptcy court as a routine collection device would quickly paralyze this court"). As the Eleventh Circuit has noted, bad faith has been found to exist "when a creditor's actions amount to an improper use of the Bankruptcy Code as a substitute for customary collection procedures." *General Trading Inc.,* 119 F.3d at 1501 (quoting *Better Care, Ltd.,* 97 B.R. at 410).

**D. SDC's Other Motives for Filing the Involuntary Petition are Improper**

There is some evidence in the record that SDC's filing was motivated by the dual desire of shutting down Smith's business operations and seeking to have him criminally prosecuted. (Smith Ex. 26; Smith Ex. 28; and Smith Ex. 43). Such motivations are unacceptable and can not be condoned by the Court.

Moreover, Day and Ellenberg were evidently motivated in part by a concern that Turrentine and Canterbury Square would either get paid or obtain judgments before SDC. (Tr. at 371, ll. 5–4; Tr. at 536, l. 18—p. 537, l. 1; Smith Ex. 26). In *General Trading Inc.,* the Eleventh Circuit held that protecting against other creditors' obtaining a disproportionate share of a debtor's assets "is a proper purpose for filing an involuntary petition." 119 F.3d at 1502 (citation omitted). The facts in *General Trading Inc.* warranting that conclusion are much more severe than the facts in the present case. For example, the debtor was liquidating the petitioning creditor's collateral and using the funds to satisfy the claims of other creditors. *Id.* The debtor's principal made verbal threats that he would continue to sell the debtor's assets

without remitting any money to the petitioning creditor. *Id.* at 1502–03. Further, the evidence reflected numerous high dollar transfers to insiders. *Id.* at 1503.

Here, Turrentine had a note that was not due until four months after the filing date. To the extent Canterbury Square had a claim against Smith, it was unliquidated as of April 8, 1998.[47] There is no evidence that Smith was preferring Turrentine or Canterbury Square, or any other creditors, at the expense of SDC. There is no evidence that Smith was contemplating preferring certain creditors over SDC. There is no evidence that Smith was liquidating his assets. Under the circumstances in this case, SDC's fear that Canterbury Square might get a judgment against Smith is insufficient to establish the propriety of an involuntary petition. If the Court were to rule otherwise, any person or entity in litigation would be subject to an involuntary bankruptcy filing. Likewise, SDC's fear that Turrentine might get paid before it gets paid constitutes an insufficient reason to establish the propriety of an involuntary petition.

**E. SDC's Failure to Properly Investigate the Turrentine Note**

The Court noted earlier that Smith signed a promissory note in favor of Turrentine on February 15, 1998, which by its terms did not mature until August 15, 1998. (Smith Ex. 1). In the Supplemental Allegations filed concurrent with the petition, SDC averred that Turrentine's note was past due. (Supplemental Allegations ¶ 5). Steinemann, Day, and Levenson all testified that Turrentine led them to believe during telephone conversations that his note was past due. (Tr. at 222, ll. 1–24; Tr. at 276, l. 18—p. 277, l. 6; Tr. at 278, l. 23—p. 279, l. 1; Tr. at 393, ll. 21–23).[48]

---

**47.** Canterbury Square and Smith were in prepetition litigation that was nearing trial when the involuntary was filed. While the Court knows nothing about the sum and substance of the litigation, Canterbury Square did attempt to settle with Smith, a fact that was well known to SDC's representatives. (Tr. at 274, ll. 5–10; Tr. at 363, ll. 18–25; Tr. at 501, ll. 17–23). Upon the filing of the involuntary petition, the Canterbury Square litigation was automatically stayed. *See* 11 U.S.C. § 362(a).

**48.** Turrentine admitted at his deposition that he told SDC's representatives that Smith owed him money. Turrentine, however, did

Levenson admitted on the stand that he asked Turrentine for a copy of the note, but that he failed to ask him for the note's specific due date. (Tr. at 279, l. 2—p. 280, l. 4). Ellenberg obtained what information he had about Turrentine's note solely from Steinemann, Day, and Levenson. (Tr. at 490, ll. 5–16).

Ellenberg conceded that the note did not mature by its terms until four months after the involuntary petition was filed. (Tr. at 495, ll. 13–18). The following exchange occurred at trial between Smith's counsel and Ellenberg, with Smith's counsel posing the question:

QUESTION: Had you known that the note was due in August of 1998, would you still have filed this bankruptcy petition?

ANSWER: If I had known that, would I have filed this? I sure would have thought a whole lot harder on it. I believe it's appropriate to file a petition on an unliquidated but certain to be substantial amount of money, but it would substantially change the facts in this case as I would weigh them under the criteria of whether or not Mr. Smith was generally paying his debts as they came due. If I had seen that note on February 25th and it said it was coming up due, the answer is I'm not sure. I would have been an awful lot more reticent about it. I believe one of my letters to the client said I was depending upon that fact and if that fact wasn't accurate, it would cause me to rethink the case a great deal.

(Tr. at 495, l. 19—p. 496, l. 12). Another exchange between Smith's counsel and Ellenberg about Turrentine's claim is equally as cogent:

QUESTION: A few minutes ago you testified that it would be and is material, that had you known the true facts abut the Turrentine note, the Bronnie Smith claim, the David Flint claim. So, with

that in mind, how can you now say the petition was well grounded in fact?

ANSWER: The petition, when filed, did rest upon the Turrentine claim, that that was a past due claim. And the petition, when filed, was based on that fact and is well grounded in fact and law as filed.

Assuming the Turrentine claim is, in fact, not a past due obligation but is a forbearance, I believe, under weighing all the factors of generally paying his debts as they become due, that this is one in which The Court could decide easily that Mr. Smith was still generally not paying his debts as they become due.

It's a harder case, and I'm not suggesting, frankly, that I would—I certainly would have a whole lot more thought, wouldn't have brought it, knowing that fact. But I would certainly, on the facts I know, today, if I was a judge, and here is why you have a judge to weigh the factors, would adjudicate and would have no trouble writing an opinion supporting an adjudication in this case.

(Tr. at 519, l. 7—p. 520, l. 8). Despite his testimony that he "wouldn't have brought it" or that he "would have thought a whole lot harder" about filing the petition had he known the note's due date, Ellenberg informed the Court that he did not feel it was important to obtain a copy of the note since Turrentine allegedly made statements to other parties that the note was past due. (Tr. at 496, l. 24—p. 497, l. 8).

A creditor that predicates an involuntary filing on telephone calls rather than documentary evidence is asking for trouble. The note's due date was a material fact which was capable of SDC's discovery and should have been discovered prior to filing. Regardless of what Turrentine may or may not have said about the note's due date, SDC falsely, and perhaps recklessly, alleged in the petition that the note was past due. *Cf. Myron M. Navison Shoe Co. v. Lane Shoe Co.*, 36 F.2d 454, 459 (1st

not recall telling them that the note was past due. (Turrentine Deposition at 13, l. 15—p.

14, l. 4; Turrentine Deposition at 20, l. 9—p. 21, l. 18).

Cir.1929) (finding of fraud on petitioning creditor's part can be based on knowingly alleging false information, or by reckless disregard of the truth or falsity of the information).

As far back as February 26, 1998, SDC knew that a one creditor involuntary filing was a risky proposition. (Smith Ex. 28). SDC could have eliminated at least one risk by conducting a complete and accurate inquiry into Turrentine's claim. Ellenberg candidly admitted that he may not have recommended an involuntary petition had he known the true facts regarding Turrentine's note.

*F. SDC's Failure to Disclose Bronnie Smith and Schreeder, Wheeler & Flint as Creditors*

Similarly, the Court questions the thoroughness of SDC's pre-filing investigation of creditors. Levenson informed the Court that his involvement with respect to determining the number of Smith's creditors was basically limited to turning his files over to Ellenberg for review. (Tr. at 294, ll. 4–20). In an affidavit filed with the Court, Levenson stated: "I was instructed to provide to Ellenberg all of the information, discovery and investigation that my office had obtained so that it could be evaluated. I did, in fact, comply with these instructions." (Levenson Affidavit ¶ 12, July 2, 1998).

Levenson had been in contact with Bronnie Smith sometime in the latter part of 1997. (Tr. at 298, l. 22—p. 300, l. 7). He knew that Smith and Bronnie Smith were divorced, that children were borne of their marriage, and he assumed that a divorce decree governed their post-marital affairs. (Id.). Levenson admitted at trial that he failed to disclose to Ellenberg that Bronnie Smith might be a possible creditor. (Tr. at 323, ll. 2–23; Tr. at 327, ll. 5–9). Not only did Ellenberg acknowledge that he was not made aware of Bronnie Smith, he also admitted that any pre-filing information about her would have been material to his investigation. (Tr. at 498, ll. 19–20; Tr. at 499, ll. 5–12).

Similarly, Levenson did not tell Ellenberg that Smith owed money to Schreeder, Wheeler & Flint. (Tr. at 323, l. 24—p. 324, l. 21; Tr. at 327, l. 5–13). At trial, Smith's counsel asked Levenson the following question:

QUESTION: Well, you didn't disclose Mr. Flint and Ms. Bronnie Smith to Mr. Ellenberg, did you?

ANSWER: I think you're probably right. I probably did not disclose Bronnie Smith as a creditor of David Smith. As to David Flint, I don't think I denominated him as a creditor because it wasn't my job description to identify and number creditors, but Mr. Flint was known to everyone to be a person who David Smith owed money to.

(Tr. at 327, ll. 5–13). Ellenberg could only concede that information regarding the firm's claim would have been helpful to him during his pre-filing investigation of Smith's case. (Tr. at 500, ll. 11–15).

"Bad faith can be measured by what the petitioning creditor knew or should have known about the number of debtor's creditors at the time of filing the petition." *In re Dino's,* 183 B.R. at 783 (citing *In re Crown Sportswear, Inc.,* 575 F.2d 991 (1st Cir.1978)); *see also Basin Elec. Power Coop. v. Midwest Proc. Co.,* 769 F.2d 483 (8th Cir.1985). Levenson had information about possible creditors of Smith that, for whatever reason, was not communicated to Ellenberg. The bottom line is that SDC took the serious act of filing an involuntary petition without disclosing known information about Smith's creditors. The Court can not condone such conduct. *Cf. Downers Grove Nat'l Bank v. Fox (In re Fox),* 1994 WL 484596, at *6 (N.D.Ill.1994) (petitioner can not ignore the results of its pre-filing investigation or "conduct its investigation in such a way as to purposefully avoid any information that might prevent the proper filing of the petition").

*G. Application of the Bad Faith Standard to the Instant Case*

Under any reasonable interpretation and application of the objective/subjective bad faith standard, this Court concludes that SDC filed the involuntary petition in bad faith.[49] SDC's concern that Smith was fraudulently transferring his assets pre-petition lacks both an evidentiary foundation and the element of sincerity. This case represents a two party dispute. SDC filed this case out of frustration with the state court judicial system. Despite its frustration, there is no discernible reason why SDC can not pursue its claims against Smith under the laws of the State of Georgia. Further, SDC's pre-filing investigation does not pass muster under Rule 9011 of the Federal Rules of Bankruptcy Procedure. Based on the facts and circumstances of this case, the Court concludes that it was unreasonable for SDC to file an involuntary Chapter 7 petition against Smith.

### CONCLUSION

After careful consideration of the record in this case and the applicable legal standards, the Court hereby concludes:

a. As of the petition date, SDC held a claim against Smith that was not contingent as to liability;

b. As of the petition date, SDC held a claim against Smith that was not the subject of a bona fide dispute;

c. As of the petition date, SDC's claim exceeded $10,775;

d. SDC failed to establish that Smith had less than twelve (12) creditors as of the petition date;

e. As of the petition date, Smith was generally not paying his debts as said debts became due; and

f. SDC filed the involuntary petition against Smith in bad faith.

Upon motion, the Court will entertain Smith's request for damages under § 303(i). At such time as the Court hears Smith's request for damages, the Court will consider Smith's Motion for Imposition of Sanctions Pursuant to Federal Rules of Bankruptcy Procedure 9011. The automatic stay in this case is hereby lifted to allow SDC to prosecute its action against Smith presently pending in the State Court of Fulton County. An order disposing of Smith's Motion for Sanctions Against SDC for Willful Violation of the Automatic Stay will be entered shortly.

**IT IS SO ORDERED.**

49. The Court realizes that its finding of bad faith could result in serious consequences to SDC and its representatives. It was quite evident during the four-day trial that the relationship between Smith and SDC's representatives is marred by much bitterness.

SDC was represented at trial by Mr. J. Littleton Glover, Jr. Mr. Glover was not in-volved in this case at the time the petition was filed. Thus, he had nothing to do with the decision to file the involuntary petition against Smith. The Court appreciates the professionalism and the competence demonstrated by both Mr. Glover and Mr. Scott Riddle, Smith's counsel, throughout this difficult proceeding.